# United States Court of Appeals
## For the First Circuit

Nos. 07-2190, 07-2204

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PENNSYLVANIA,

Plaintiff/Fourth-Party Defendant-Appellee/Cross-Appellant,

v.

WEST LAKE ACADEMY, et al.,

Defendants/Third-Party Plaintiffs,

v.

THE TRAVELERS INDEMNITY COMPANY; AON RISK SERVICES;
B.K. MCCARTHY INSURANCE AGENCY,

Third-Party Defendants,

JANE DOE, a/k/a JENNIFER CORNISH WILLIAMS,

Third-Party Defendant/Fourth-Party Plaintiff-Appellant/Cross-
Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin and Dyk[*], Circuit Judges,
and Dominguez[**], District Judge.

[*]Of the Federal Circuit, sitting by designation.

[**]Of the District of Puerto Rico, sitting by designation.

Samuel J. Perkins, with whom Jocelyn M. Sedney, Leonard H. Kesten, Deidre Brennan Regan, and Brody, Hardoon, Perkins, & Kesten, LLP, were on brief, for fourth-party plaintiff-appellant.

Mark Edward Cohen, with whom The McCormack Firm was on brief, for fourth-party defendant-appellee.

November 13, 2008

**DYK**, <u>Circuit Judge</u>.    Fourth-party plaintiff Jane Doe ("Doe") appeals from a final judgment in favor of fourth-party defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union").   In a prior Massachusetts state court action, Doe obtained a judgment against one of National Union's insureds, Ed Hovestadt.   In this appeal, Doe challenges a final judgment in favor of National Union entered by the United States District Court for the District of Massachusetts based on (1) an adverse jury verdict on Doe's claims under Mass. Gen. Laws ch. 93A, § 9, for failure to settle an insurance claim; (2) summary judgment on Doe's claim to recover on Hovestadt's insurance coverage;  and  (3)  summary  judgment  on  Doe's  claim  for misrepresentation by National Union as to the policy limits.  For the reasons stated below, we affirm.

## I.  Background

Between 1993 and June 1995, Doe, who was at the time a minor, was involuntarily committed to West Lake Academy ("West Lake"), a facility for mentally ill teenagers.   In June 1995, Jeffrey Senechal, a West Lake employee, transported Doe between West Lake and a bus station on several occasions without another staff member's being present. On at least some of these occasions, Senechal had sexual intercourse with Doe.  Doe became pregnant, and although Senechal initially denied having had sexual intercourse with Doe, he has since admitted that he engaged in sexual

-3-

intercourse with her and, indeed, he was deemed the father of Doe's child. Ed Hovestadt, another West Lake employee, was allegedly negligent in allowing Senechal to travel alone with Doe.

National Union provided a commercial general liability insurance policy (the "National Union policy") to West Lake, Health and Education Services, Inc. ("HES," a corporate parent of West Lake), and their employees, including Hovestadt (collectively "the insureds").

In November 1997 Doe filed a suit in Massachusetts Superior Court against Senechal, West Lake, and HES. Doe asserted, inter alia, that Senechal's sexual activity with her was actionable and that West Lake and HES were negligent in their security, hiring, training, and supervision. Doe later amended her complaint to add as defendants several additional West Lake employees, including Hovestadt, on a theory that they negligently allowed Senechal to be alone with Doe. After trial, Senechal and Hovestadt were found liable to Doe. Doe obtained a judgment against Senechal alone in the amount of $500,000 for intentional infliction of emotional distress and against Senechal and Hovestadt jointly in the amount of $750,000 on the theory that Hovestadt was negligent in allowing Senechal to transport Doe alone, which proximately caused Doe's injury. See Doe v. Senechal, 845 N.E.2d 418 (Mass. App. Ct. 2006). The total judgment was for $1.25 million plus interest, and this judgement was affirmed on appeal

-4-

and became final. Doe's claims against National Union in the present case are based on the judgement for $750,000 plus interest against Hovestadt. As will be seen, Doe asserts that under the policy National Union was obligated to pay Hovestadt the amount of Doe's judgment against him. She asserts a right to stand in Hovestadt's shoes insofar as Hovestadt had claims against National Union by virtue of the National Union insurance policy.

On July 28, 2000, National Union filed suit in the District Court for the District of Massachusetts against its insureds, including West Lake, HES, Senechal, and Hovestadt. National Union's complaint sought a declaratory judgment limiting its exposure under the policy. Among a series of exclusions from the commercial general liability coverage, the National Union policy included an "Abuse or Molestation Exclusion," which excluded from coverage claims based on abuse or molestation of anyone in the custody of the insureds. Limited coverage for such claims was provided through a "Sexual Abuse Endorsement." National Union's theory was two-fold. National Union asserted that the Abuse or Molestation Exclusion and the Sexual Abuse Endorsement limited coverage for the claims at issue to $100,000 per occurrence and $300,000 in total.[1] National Union also asserted that the policy

---

[1]With respect to Senechal, National Union sought a further declaration that because Senechal engaged in intentional sexual contact with Doe, he was not covered under National Union's policy with respect to that contact. Senechal failed to answer National Union's complaint, and as a result was deemed to have defaulted as to this claim.

coverage provided by the Sexual Abuse Endorsement was what is known in the industry as a "wasting" policy. Under a wasting policy, the coverage provided is reduced by the amount paid by the insurance company to defend against claims brought by third parties against the insured. There is no dispute that the commercial general liability provisions of the National Union policy were not wasting, but National Union contended that coverage under the Sexual Abuse Endorsement was wasting.

The insureds (with the exception of Senechal), in turn, answered and counterclaimed against National Union asserting violations of Massachusetts insurance regulations and consumer protection statutes, including claims under Mass. Gen. Laws chs. 176D, § 3(9)(f) and 93A, § 9 (hereinafter the "Chapter 93A claim") that National Union failed to take reasonable steps to effectuate prompt settlement of Doe's claim against Hovestadt after liability had become reasonably clear.[2] The insureds also asserted third-party claims against other parties, including The Travelers Indemnity Company of Illinois ("Travelers"), which had issued an umbrella liability policy covering the insureds, and Doe. While

---

[2]Section 9 of Chapter 93A provides a private cause of action on behalf of "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful" by, among other statutory provisions, section 3(9) of Chapter 176D. Mass. Gen. Laws ch. 93A, § 9(1). Section 3(9) of Chapter 176D prohibits certain "Unfair claims settlement practices" including "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f).

the Travelers dispute was settled and is not directly involved in this appeal, the dispute between the insureds and Travlers nonetheless is pertinent for reasons described below.

Doe answered as a third-party defendant, and later amended her answer to include fourth-party claims against National Union (and other parties, including Travelers), asserting the same claims that Hovestadt, as an insured, had asserted against these parties. She claimed to stand in Hovestadt's shoes both as Hovestadt's judgment creditor and as his assignee.[3] Doe ultimately asserted three claims against National Union. First, Doe alleged that she had a right to recover on the insurance policy, up to the applicable policy limits, to satisfy the judgment against Hovestadt. She contended that the policy limits were not limited by the Abuse or Molestation Exclusion and that the coverage provided by the Sexual Abuse Endorsement was not wasting. Second, Doe asserted a Chapter 93A claim for failure to settle. Finally, Doe asserted (apparently in the alternative) a claim that National Union misrepresented to the insureds the nature and scope of coverage available, leading the insureds to believe that the policy

---

[3]While this case was pending in the district court, Doe obtained an assignment of rights from Hovestadt, and now asserts his counterclaims against National Union, as well as her own claims. There has been no showing that there is any difference in the substance of these claims based on whether Doe pursues them in her own name or as Hovestadt's assignee.

-7-

coverage was not limited to the Sexual Abuse Endorsement and that the Endorsement coverage was not wasting.

On February 27, 2007, the district court granted summary judgment in favor of National Union as to Doe's coverage and misrepresentation claims, finding that coverage for the claims at issue was limited by the Abuse or Molestation Exclusion and that the coverage provided by the Sexual Abuse Endorsement was wasting. The court also found that there was no misrepresentation by National Union concerning the policy's wasting nature. The district court denied summary judgment as to Doe's failure-to-settle claim under Chapter 93A, concluding that there was a material issue of fact as to whether National Union had offered to settle Doe's claim. Doe's Chapter 93A claim for failure to settle proceeded to a jury trial. On May 11, 2007, the jury returned a verdict in favor of National Union as to the Chapter 93A claim. The district court entered a final judgment in National Union's favor on the same day. On May 25, 2007, Doe moved for judgment as a matter of law, or, alternatively, a new trial. The district court denied Doe's motion on July 2, 2007.

Doe timely appealed the district court's judgment, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Although National Union prevailed below on Doe's Chapter 93A claim, it cross appeals on the question of whether Doe should have had to prove that she

would have accepted a policy-limit offer in order to recover on the claim.

## II. Policy Interpretation

Doe urges that the district court erred in construing the limitations of coverage imposed by the National Union policy. "Under Massachusetts law, the interpretation of an insurance policy and the application of policy language to known facts pose questions of law for the court to decide. In the absence of an ambiguity, we must construe the words of the policy in their usual and ordinary sense." Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 276 (1st Cir. 2008) (internal citations omitted). We "construe an insurance policy under the general rules of contract interpretation. We begin with the actual language of the policies, given its plain and ordinary meaning. In so doing, we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000) (internal citations and quotation marks omitted).

### A. Abuse or Molestation Exclusion

Doe contends that the district court erred in interpreting the Abuse or Molestation Exclusion to bar coverage for her claims under the commercial general liability provisions of the National Union policy. If Doe were to prevail on this coverage issue, she asserts that a new trial would be required on her

Chapter 93A claim, and that she should be entitled to summary judgment on her claim to recover up to $1,000,000 under the policy to satisfy her judgment against Hovestadt (including post-judgment interest).

The commercial general liability provisions of the National Union policy include limitations of $1,000,000 per occurrence and $3,000,000 aggregate, while the coverage provided by the Sexual Abuse Endorsement is limited to $100,000 per occurrence and $300,000 aggregate. The district court granted summary judgment on this issue. The district court reasoned that because Doe's Massachusetts Superior Court claims against Hovestadt arose out of sexual abuse, the Sexual Abuse Endorsement of National Union's policy limited the available coverage to $100,000.

We think that the district court properly interpreted the Abuse or Molestation Exclusion to limit coverage to that provided by the Sexual Abuse Endorsement.

In establishing coverage under a commercial general liability policy, such as the National Union policy here, "the insured bears the burden of proving coverage . . . . If the insured satisfies his burden, then the insurer must prove that an exclusion applies in order to avoid coverage." Nascimento, 513 F.3d at 277 (internal citations omitted).

> Consistent with the Massachusetts general rule favoring insureds in policy interpretation, any ambiguities in the exclusion provision are strictly construed against the insurer.

> Ambiguity exists when the policy language is susceptible to more than one rational interpretation. But it does not follow that ambiguity exists solely because the parties disagree as to the provision's meaning.

Brazas Sporting Arms, 220 F.3d at 4-5 (internal citations omitted).

The commercial general liability provisions of the National Union policy provided that National Union would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." J.A. at 3811. The Abuse or Molestation Exclusion, however, excluded certain types of claims from coverage under the commercial general liability provisions. It stated:

> This insurance does not apply to "bodily injury," "property damage," "advertising injury" or "personal injury arising out of:
>
> (a) the actual or threatened abuse or molestation by anyone of any person while in the care custody, or control of any insured, or
>
> (b) the negligent: (i) employment; (ii) investigation; (iii) supervision; (iv) reporting to the proper authorities, or failure to so report; or (v) retention; of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (a) above.

J.A. at 3821 (emphasis added). The Sexual Abuse Endorsement provided more limited coverage. It provided, in relevant part, as follows:

> It is hereby agreed that Section 1 COVERAGES, COVERAGE A, 1. Insuring Agreement and COVERAGE B, 1. Insuring Agreement are replaced by the

-11-

> following Insuring Agreement with respect to the coverages provided by this endorsement:
>
> Insuring Agreement
>
> We will pay for those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "personal injury" arising from sexual abuse, sexual molestation or sexual exploitation but only if (1) "bodily injury" or "personal injury" is caused by an "occurrence" that takes place in the "coverage territory", and (2) the "bodily injury" or "personal injury" occurs during the policy period. . . .

J.A. at 3831-32 (emphases added). Coverage under the Sexual Abuse Endorsement was limited to: "$100,000 per occurrence 'bodily injury' as defined . . . below and 'personal injury' as defined in the policy. $300,000 Aggregate." J.A. at 3831.

Doe argues that, while the exclusion bars recovery for sexual "abuse or molestation" under the commercial general liability provisions of the policy, those provisions must be interpreted to provide coverage for "sexual exploitation." She notes that, although the Sexual Abuse Endorsement uses the terms "sexual abuse," "sexual molestation," and "sexual exploitation" separately, the Abuse or Molestation Exclusion excludes from coverage under the commercial general liability provisions of the policy only "abuse" and "molestation." Doe contends that sexual exploitation claims are accordingly not excluded from the commercial general liability provision, apparently contending that sexual exploitation claims are covered both under the Endorsement

-12-

and the commercial general liability provisions of the policy. Finally, she asserts that her claims against Hovestadt and Senechal arose from sexual exploitation rather than abuse or molestation.

Despite the slight difference in wording, it is obvious that the Abuse or Molestation Exclusion and the Sexual Abuse Endorsement are intended to have the same scope, and that the Endorsement is designed to provide more limited coverage for the same risks that the exclusion removes from coverage under the commercial general liability provision. We thus think it likely that Doe is incorrect in urging that "sexual exploitation" is covered by the commercial general liability provisions of the policy. However, even if we were to assume that the commercial general liability provisions of the National Union policy provided coverage for sexual exploitation, as Doe contends, we think that the present case involves sexual abuse rather than sexual exploitation.

The general definition of "sexual abuse" is "[a]n illegal sex act, esp[ecially] one performed against a minor by an adult." Black's Law Dictionary 10 (8th ed. 2004).[4] The general definition of "sexual exploitation" is "[t]he use of a person, esp[ecially] a child, in prostitution, pornography, or other sexually manipulative activity that has caused or could cause serious emotional injury."

---

[4]Black's defines the more general term "abuse" as "[p]hysical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury." Black's Law Dictionary 10.

-13-

<u>Id.</u> at 1407.[5]  Under this definition the acts in question involved sexual abuse rather than exploitation.

Senechal admitted that he engaged in sexual intercourse with Doe, and he was deemed the father of Doe's child.  Thus, there is no question that Senechal engaged in an "illegal sex act," consistent with sexual abuse, but there has been no contention that Senechal used Doe to further some advantage of his own through prostitution, pornography, or other such "sexually manipulative activity."  We conclude that the district court properly held that Doe's claim arose from sexual abuse, that Doe's claim was excluded from the commercial general liability provisions of the National Union policy, and that Doe's claim was covered only under the Sexual Abuse Endorsement, thus making Doe's claim subject to the limitations of coverage provided in the Endorsement.[6]

---

[5]Black's defines the more general term "exploitation" as "[t]he act of taking advantage of something; esp[ecially], the act of taking unjust advantage of another for one's own benefit."  <u>Black's Law Dictionary</u> 619.

To be sure, the Federal Sentencing Guidelines Manual uses a broader definition of the joint term "sexual abuse or exploitation."  See U.S. Sentencing Guidelines Manual § 2G2.2 cmt. n.1 (2007).  Although this definition would encompass Doe's claim, we think it unlikely that an insurance policy should be viewed as adopting the specialized definition used in the Guidelines manual. In any event, because this definition combines the concepts of sexual abuse and exploitation, it offers no guidance as to what conduct would constitute sexual exploitation, as opposed to sexual abuse.

[6]Doe also appears to contend that National Union misrepresented the scope of the Abuse or Molestation Exclusion to the insureds.  The district court properly rejected this contention, which is without basis in the record.

## B. Wasting

Doe also urges that the district court erred in granting summary judgment to National Union by interpreting the Sexual Abuse Endorsement of the National Union policy to be a wasting policy and in determining that the entire available coverage had been exhausted by defense costs. The district court concluded that "[d]efense costs may reduce the aggregate limit under the sexual abuse endorsement," and that "the expenditure by National Union of more than $300,000 in defense of this action . . . has exhausted the limits of its insurance policy." J.A. at 1127.

Doe argues that the Sexual Abuse Endorsement does not unambiguously state that defense costs erode the limitations of coverage provided in the Endorsement, emphasizing that any ambiguity must be resolved against the insurer. See, e.g., Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997) ("'[W]here the language permits more than one rational interpretation, that most favorable to the insured is to be taken.'" (quoting Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 12, 545 N.E.2d 1156, 1159 (1989))). Although Doe is correct that the language of the Sexual Abuse Endorsement is not a model of clarity, we do not agree that it is ambiguous in this respect.

Two provisions of the policy are involved here, the Supplementary Payments provision of the general policy and the

-15-

language of the Sexual Abuse Endorsement. The Supplementary Payments provision of the general policy, entitled "SUPPLEMENTARY PAYMENTS—COVERAGES A AND B", provides coverage for costs associated with defending a covered suit, including "all expenses we [National Union] incur," in addition to the coverage for damages for "bodily injury."[7]   J.A. at 3814.  The Supplementary Payments provision

[7]The "SUPPLEMENTARY PAYMENTS—COVERAGES A AND B" language of the main commercial general liability policy provides, in relevant part:

We will pay, with respect to any claim or "suit" we defend:

1.  All expenses we incur.

2.  Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies.  We do not have to furnish these bonds.

3.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds.

4.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work.

5.  All costs taxed against the insured in the "suit".

6.  Pre-judgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

7.  All interest on the full amount of any judgment [that] accrues after entry of the judgment and before [we] have paid, offered to pay, or deposited in court [the] part of the judgment that is within the applic[able] limit of insurance.

-16-

expressly states that "These payments will not reduce the limits of insurance," J.A. at 3814, and National Union does not dispute that the commercial general liability provisions of the National Union policy are not wasting. However, National Union asserts that the coverage under the Sexual Abuse Endorsement is wasting.

We agree with National Union that the Sexual Abuse Endorsement unambiguously states that the $300,000 aggregate limit is reduced by defense costs. The first paragraph of the Endorsement establishes a coverage limit of "$100,000 per occurrence 'bodily injury' as defined . . . below and 'personal injury' as defined in the policy," and in the next sentence limits such payments to "$300,000 Aggregate." J.A. at 3831. The wasting nature of the policy is made clear by paragraph (B) of the Endorsement, which states that "[t]he aggregate limits shall include all Supplementary Payments as described in the section of this policy SUPPLEMENTARY PAYMENTS COVERAGES A AND B in addition to all damages paid for 'bodily injury' or 'personal injury' under this endorsement."[8] J.A. at 3831 (emphasis added). Thus, while

_____

These payments will not reduce the limits of insuranc[e].
J.A. at 3814.

[8]In full, paragraph (B) of the Sexual Abuse Endorsement provides as follows:

    B)     The most we will pay under this policy for damages for such "bodily injury" and "personal injury" is limited to the per occurrence limits and the total damages to the aggregate limits shown above in the ADDITIONAL DECLARATIONS [which provides "$100,000

-17-

National Union's liability for payments for "bodily injury" or "personal injury" is limited to $300,000 in aggregate, paragraph (B) also states that "in addition" to including "all damages paid" for bodily or personal injury, "the aggregate limits shall include"--that is, take account of, or be reduced by--"all Supplementary Payments." Id.

That the aggregate limit includes both damages for injury and Supplementary Payments such as defense costs (and hence is wasting) is confirmed by the second provision of paragraph (B). While the Supplementary Payments provision of the commercial general liability policy states that such supplemental "payments will not reduce the limits of insurance," J.A. at 3814, this provision is "overridden by [the] endorsement." J.A. at 3831. The second provision of paragraph (B) of the Endorsement states that

> per occurrence" and "$300,000 Aggregate"]. The aggregate limits shall include all Supplementary Payments as described in the section of this policy SUPPLEMENTARY PAYMENTS COVERAGES A AND B in addition to all damages paid for "bodily injury" or "personal injury" under this endorsement.
>
> Notwithstanding the statement in that section that payments will not reduce the limits of insurance now overridden by this endorsement, the per occurrence and Aggregate limits expressed are the only limits regardless of the number of (1) insureds; (2) claims made or suits brought; or (3) persons or organizations making or bringing suits. These limits will be the only limits available for coverage under this endorsement not withstanding anything contained in Section III – LIMITS OF INSURANCE.

J.A. at 3831.

"Notwithstanding the statement in [the Supplementary Payments] section that payments will not reduce the [commercial general liability policy] limits of insurance now overridden by this endorsement, the per occurrence and Aggregate limits expressed are the only limits . . . ." Id. (emphasis added). This language makes clear that "payments" under the Supplementary Payments provision will reduce available coverage under the Endorsement, even though such "payments will not reduce the limits" under the general policy. And paragraph (C) further underscores the wasting nature of the Endorsement, stating that National Union's "right and duty to defend end when [National Union] ha[s] used up the applicable limit of insurance as described above." J.A. at 3832 (emphasis added). We conclude that the district court correctly interpreted the Sexual Abuse Endorsement as a wasting policy.

Doe additionally contends that defense costs are not included within the term "expenses" as used in paragraph (1) of the "SUPPLEMENTARY PAYMENTS—COVERAGES A AND B" provision of the National Union policy, and therefore do not count against the Sexual Abuse Endorsement's aggregate limit because they are neither damages for injury nor Supplementary Payments. However, we have no doubt that defense costs are included as "expenses" within the meaning of Supplementary Payments. There is no dispute that the commercial general liability provisions of the National Union policy were designed to obligate National Union to defend the

-19-

insureds and to pay defense costs. Excluding defense costs from the Supplementary Payments covered would defeat this purpose. We agree with the district court that defense costs are included within the category of "expenses," which are Supplementary Payments that count against the Endorsement's aggregate limit.

In short, we conclude that given its "plain and ordinary meaning," Brazas Sporting Arms, 220 F.3d at 4, the language of the Sexual Abuse Endorsement unambiguously indicates that payments for defense costs erode the $300,000 aggregate limit of coverage provided by the Endorsement, and the district court did not err in so holding.[9]

### III. Chapter 93A Claim--Evidence of a Policy-Limit Offer

Doe contends that the jury verdict in favor of National Union as to her Chapter 93A claim is against the overwhelming weight of the evidence. Doe's theory at trial was that National Union had violated Chapter 93A by failing to make a reasonable offer of settlement in the policy amount, even if the policy limit was $100,000. National Union contended that it had made a $100,000 offer of settlement. Doe urges on appeal that no reasonable juror could conclude that such an offer was made. We disagree.

---

[9] We also agree with the district court that Doe's claim that National Union misrepresented the wasting nature of the Endorsement is unsupported by the record. Indeed, record evidence shows that before the policy's effective date, HES's insurance broker was informed that the Endorsement was wasting via a fax transmission stating: "Note, defense costs are within the sexual abuse limits." J.A. at 10.

Although the issue was disputed at trial, there was ample evidence from which a reasonable juror could conclude that National Union offered to settle Doe's claim for $100,000. National Union's witnesses described at least two occasions when they made such an offer. Janette Woodbury, a director in National Union's complex claims unit who managed Doe's claim for National Union, testified that she made an offer to one of Doe's lawyers, Richard Brody, by telephone in approximately February 1999, and that Brody rejected this offer.

> I told him [Brody] that there was only $100,000 coverage available in the case and that I was offering the money as settlement if it could settle the case and preclude further litigation.
>
> . . . .
>
> He [Brody] said that $100,000 was not going to settle the case and that HES was going to have to come to the table, was his term, with some money of their own.

J.A. at 2439-40.

Woodbury also testified that she told one of the defense lawyers retained by National Union, Daniel Gibson, about this conversation. Gibson testified at trial, and his testimony confirmed that a $100,000 offer had been made and rejected: "I had a discussion with Rick [Brody] in which I said to Rick I understand that a hundred thousand dollars has been offered to settle the case. And he said it has and it will not, my demand is 3 million and there's other assets we can collect against." J.A. at 2832.

-21-

Finally, Woodbury testified that she followed up by reiterating her offer to Brody in June 1999 when she told Brody "I still only had a hundred thousand dollars available" and Brody "basically again said that the hundred thousand wasn't going to settle the case and that our insured was going to have to contribute some money to get . . . the case settled." J.A. at 2460.

Brody testified that neither Woodbury nor anyone else had ever made an offer to settle Doe's claim for $100,000. J.A. at 2617. However, the fact that Brody's testimony conflicts with Woodbury's certainly does not entitle Doe to judgment as a matter of law on her Chapter 93A claim. It is precisely the jury's role to resolve such conflicting factual testimony. We conclude that the evidence was sufficient to allow a reasonable juror to conclude that National Union offered to settle Doe's claim for $100,000.[10]

## IV. Lack of a Written Settlement Offer

_____

[10]Woodbury also testified that during a mediated settlement conference, she authorized the mediator, Mr. Fitzgerald, to convey to Doe an offer to settle the case for $100,000. "I told Mr. Fitzgerald that we had $100,000 in coverage, that it had been offered on more than one occasion and that it was still available if it would settle the claim. J.A. at 2498. Woodbury's testimony in this regard was again corroborated by Gibson's testimony. See J.A. at 2831. We need not consider whether the testimony that Woodbury authorized the mediator to make an offer to Doe, standing alone, would be sufficient to support the jury verdict. To the extent that Doe is arguing that the evidence of the offer to the mediator was improperly admitted in the first place, this argument was not preserved by a timely objection.

Doe urges that, even if there was evidence sufficient for the jury to find that National Union made a $100,000 offer, evidence of a written offer of settlement, rather than a mere oral offer, is required under Mass. Gen. Laws ch. 93A, § 9(3). Doe contends that the district court erred in instructing the jury that a written offer of settlement was not required and that, because it is undisputed that National Union did not make a written offer of settlement to Doe, the district court also erred in denying Doe's motion for judgment as a matter of law. We conclude that Doe's argument rests on an improper construction of the statutory language.

As discussed above, section 9(1) of Chapter 93A creates a private cause of action on behalf of "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared unlawful" by a variety of statutory provisions, including "clause (9) of section three of chapter one hundred and seventy-six D." Mass. Gen. Laws ch. 93A, § 9(1). Section 3(9) of Chapter 176D prohibits, among other things, an insurer's failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D § 3(9)(f). Thus, Doe's claim depends on proving a violation of Mass. Gen. Laws ch. 176D, § 3(9)(f), the text of which speaks only to efforts "to effectuate . . . settlement[]" and does not distinguish between written and oral

offers of settlement. Id. Mass. Gen. Laws ch. 176D, § 3(9)(f) imposes no requirement of a writing.

Doe argues, however, that Chapter 93A itself, and in particular section 9(3) requires a written settlement offer. But section 9(3) simply establishes a procedure to resolve claims under Chapter 93A, by requiring a plaintiff to file a written demand before bringing such a claim and allowing a defendant to avoid punitive damages by providing a reasonable written settlement offer in response. Section 9(3) provides in relevant part:

> At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner.

Mass. Gen. Laws ch. 93A, § 9(3). This language does not change the substantive requirements of Mass. Gen. Laws ch. 176D, § 3(9)(f) prohibiting unfair failure to settle an insurance claim.

We conclude that the district court did not err in instructing the jury that National Union was not required to present evidence of a written settlement offer to comply with Mass.

Gen. Laws ch. 176D, § 3(9)(f). In this case there can be no liability on Doe's Chapter 93A failure-to-settle claim if there has been no violation of Mass. Gen. Laws ch. 176D, § 3(9)(f).

## V. Admission of Evidence as to the Travelers Settlement

Doe contends that the district court erroneously admitted evidence. "The evidentiary rulings of a trial court will not be upset unless they involve an abuse of discretion." McInnis v. A.M.F., Inc., 765 F.2d 240, 242 n.1 (1st Cir. 1985). In Tiller v. Baghdady, 244 F.3d 9, 14 (1st Cir. 2001), we defined "abuse of discretion" as follows:

> A judge abuses this discretion "when a relevant factor that should have been given significant weight is not considered." United States v. Hastings, 847 F.2d 920, 924 (1st Cir. 1988) (quoting United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir. 1987)). We acknowledge that, "[t]here is no neat, standardized test for judging abuse of discretion; each case must be judged on its own facts and circumstances." Loinaz[ v. EG & G, Inc.], 910 F.2d[ 1, 7 (1st Cir. 1990)]; see also Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 10 (1st Cir. 1994).

We note that "[o]nly rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005) (alteration in original, quotation marks omitted).

At trial, National Union sought to introduce evidence of the amount of the settlement between Doe and Travelers, which had provided an umbrella liability insurance policy to the insureds. Doe objected to the introduction of testimony as to the amount of the settlement, arguing that the introduction of evidence of the result of her settlement negotiations with Travelers was unduly prejudicial under Rule 403 of the Federal Rules of Evidence and contrary to Rule 408, which bars the introduction of an offer or agreement to compromise a disputed claim, or the content of settlement negotiations, to prove "liability for, invalidity of, or [the] amount of" the disputed claim. Fed. R. Evid. 408(a). The district court, in admitting the evidence, reasoned that the amount of the settlement was relevant not to establish liability but to enable the computation of punitive damages for Doe's Chapter 93A claim, see Mass. Gen. Laws ch. 93A, § 9(3), and was not unduly prejudicial. The district court reasoned that if the jury determined to award punitive damages by multiplying actual damages, it would need to know the amount of the settlement to "deduct[]" the settlement amount from the amount of Doe's ultimate judgment against Hovestadt, i.e., the jury needed the amount to calculate the actual damages and thus punitive damages. J.A. at 2603.

Doe argued that no deduction for the settlement was appropriate, and alternatively, that any calculation of the damages amount could be made by the court without revealing the amount of

the settlement to the jury. Doe points out that indeed the verdict form ultimately adopted made it unnecessary for the jury to make this computation.

We need not decide whether the settlement amount was correctly admitted for computational purposes, however, since we may affirm on an alternative ground. See United States v. Nivica, 887 F.2d 1110, 1127 (1st Cir. 1989) (declining to reverse improper admission of hearsay evidence as business records, based on a conclusion that the same records could properly be admitted under the residual hearsay exception); see also Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) ("[W]e can affirm the evidentiary ruling of the district court on a ground different from that employed below . . . .").

National Union points out that Doe opened the door to the introduction of the Travelers settlement by asking about the Travelers settlement in the context of a dispute as to whether National Union had acted to delay Doe's Massachusetts litigation in bad faith, as Doe alleged, or in good faith to facilitate a settlement with Travelers, as National Union alleged.

At trial, Doe questioned witnesses as to whether National Union, for purposes of delay and in bad faith, had sought United States Supreme Court review of an order of the Massachusetts Supreme Judicial Court requiring Senechal to participate in a paternity test. So too, Doe's counsel asked Woodbury whether she

had delayed mediation proceedings between the various parties involved in this case (including Travelers) in bad faith "because you wanted one last shot to see maybe she's done it, maybe she's dead, maybe she's in an institution, and we can save money." J.A. at 2312.[11]

National Union sought to rebut this allegation of bad faith by showing that it had delayed the Massachusetts litigation and had engaged in mediation in good faith to facilitate a settlement payment from Travelers. On behalf of National Union, in answer to a question regarding what she did "in that time after the petition for certiorari [as to the paternity test] was filed," Woodbury testified that she "tried to get . . . other insurance carriers involved to come to the table with some money . . . [t]o try to get the case settled." J.A. at 2483.

After Woodbury's testimony, counsel for Doe asked the next witness, Martin Foster (an attorney retained by the insureds), about settlement negotiations between National Union, Travelers, the insureds, and Doe at a mediated settlement conference. Doe's counsel suggested that the negotiations were unproductive, thus casting doubt upon whether the delay was really designed to produce a settlement beneficial to Doe.

---

[11]The allegations of bad faith delay led the district court to instruct the jury that "it's suggested . . . that here there was delay for the sake of delay" and that evidence of bad faith delay could support punitive damages under Doe's Chapter 93A claim. J.A. at 2930.

It was in this context, upon cross examination by National Union, and over Doe's objection, that Foster was allowed to testify that Doe ultimately reached a settlement with Travelers whereby Travelers paid Doe $980,000.[12] Having introduced evidence regarding the settlement negotiations between National Union and Travelers, and having suggested that those negotiations were fruitless, Doe opened the door to introduction of evidence regarding her ultimate settlement with Travelers. See Willco Kuwait (Trading) S.A.K. v. deSavary, 843 F.2d 618, 625 (1st Cir. 1988). The district court did not err in admitting evidence of the settlement amount.

## VI.  Use of the Travelers Settlement

Doe asserts that, even if the amount of the Travelers settlement had been properly admitted for purposes of negating her allegations of bad faith delay, National Union made improper use of the settlement amount in closing argument to suggest that Doe and her counsel were greedy. Counsel for National Union argued that after it had offered Doe the policy limit of $100,000, "[t]he plaintiffs kept litigating to get more money. I'm not suggesting that's wrong. That's zealous advocacy. But you certainly cannot hold National Union liable for the plaintiff's decision or her lawyer's decision to press for more money. And in the end they got

---

[12]Later testimony, including cross-examination of Doe, revealed that Doe's total settlement with Travelers and several other parties amounted to just over $1 million.

-29-

more money." J.A. at 2958. National Union went on to suggest that

Brody was greedy in rejecting National Union's offer:

> Is there any reason that Mr. Brody would have
> to reject the offer? Of course. If he
> accepted the offer, . . . he would have
> recovered for his client a hundred thousand
> dollars. And he would have gotten, or he and
> his partners would have shared $35,000. They
> put a lot of time and effort into this case.
> So they pressed on. And at the end of the day
> -- well, we're not at the end of the day. But
> as we sit here today they've collected a
> million dollars, over a million for their
> client, over 40,000 [sic] to share amongst
> themselves, but they're here asking you for
> more money.

J.A. at 2959-60.

While the use of the Travelers settlement for this

purpose was likely improper, Doe made no objection to National

Union's argument. We review allegations of trial misconduct

forfeited due to the lack of any timely objection only for plain

error. See Fonten Corp. v. Ocean Spray Cranberries, Inc., 469 F.3d

18, 21-22 (1st Cir. 2006); Smith v. Kmart Corp., 177 F.3d 19, 25

(1st Cir. 1999) ("[W]hen no timely objection is made, claims of

improper closing argument are forfeited, not waived, and thus

amenable to review for plain error.").

> Under plain error review, we will consider a
> forfeited objection only if: (1) an error was
> committed; (2) the error was "plain" (i.e.
> obvious and clear under current law); (3) the
> error was prejudicial (i.e. affected
> substantial rights); and (4) review is needed
> to prevent a miscarriage of justice. To merit
> reversal, the error must have resulted in a
> miscarriage of justice or seriously affected

> the fairness, integrity or public reputation
> of the judicial proceedings. Plain error is a
> rare species in civil litigation, encompassing
> only those errors that reach the pinnacle of
> fault envisioned by the standard set forth
> above.

Smith, 177 F.3d at 26 (internal citations and quotation marks omitted).

Doe has not established that the error in the use of the settlement evidence was sufficiently grave to satisfy plain error review. At a minimum, Doe has failed to show that the improper remarks by National Union were so grave as to seriously impugn the fairness and integrity of judicial proceedings. Accordingly, the district court did not err in denying Doe's motion for a new trial.

### VII. Emotional Distress Damages

Doe contends that the district court erroneously directed a verdict in National Union's favor barring emotional distress damages; the district court ruled that Doe was required to present expert evidence that her emotional distress was caused by National Union's actions. In her principal brief, Doe asserted that emotional distress damages were a component of actual damages available under the Chapter 93A failure-to-settle claim. We have no occasion to consider whether Doe was entitled to present evidence of emotional distress damages in connection with her Chapter 93A claim, since we conclude that the district court

properly upheld the jury's verdict in National Union's favor as to liability on this claim.

However, Doe also argues that the district court improperly precluded the jury from considering Doe's claim for intentional infliction of emotional distress, apparently asserting that this tort claim was made independent of Doe's claim under Chapter 93A. Although Doe moved on February 1, 2007, to amend her forth-party complaint to add a claim against National Union for intentional infliction of emotional distress, that motion was denied by the district court on February 6, 2007. In her opening brief, Doe made no mention of any independent claim for intentional infliction of emotional distress, and we conclude that Doe has waived any argument in this connection.

## VIII. Cross-Appeal

National Union cross-appeals on the issue of whether Doe had to prove that she would have accepted a policy-limit offer in order to prevail as to causation with respect to her Chapter 93A claim. We conclude that National Union's cross-appeal is improper.

A cross-appeal is generally not proper to challenge a subsidiary finding or conclusion when the ultimate judgment is favorable to the party cross-appealing. See United States v. Moran, 393 F.3d 1, 12 (1st Cir. 2004) ("A cross-appeal normally is improper when taken by a defendant from a favorable judgment."); Neverson v. Farquharson, 366 F.3d 32, 39 (1st Cir. 2004)

-32-

("[R]espondents here do not seek to alter the judgment of the district court. On the contrary, the district court granted all of the relief that respondents requested. . . . Under these circumstances, a cross-appeal would have been improper."); Harding v. Fed. Nat'l Bank, 31 F.2d 914, 918-19 (1st Cir. 1929) (explaining that plaintiff's cross-appeal from a decree in the plaintiff's favor was "improperly taken"). Because the district court's final judgment was in favor of National Union as to each of the asserted claims, National Union's cross-appeal from this favorable judgment is not proper, and is dismissed.

Treating the briefing on the cross-appeal as an argument in support of the judgment, we need not reach the issue of causation. This issue is relevant only to Doe's Chapter 93A claim for failure to settle. Because the jury found in favor of National Union, there is no need to consider National Union's challenge to the district court's causation instruction. Nor is there any merit to Doe's claim that she suffered prejudice from the district court's delay in adopting her position on causation.

**CONCLUSION**

For the reasons set forth above, in Appeal No. 07-2190, the district court's judgment in favor of National Union is affirmed.

Appeal No. 07-2204 is dismissed.

It is so ordered.