# United States Court of Appeals
## For the First Circuit

No. 18-1148

UBS FINANCIAL SERVICES, INC. OF PUERTO RICO AND
UBS TRUST COMPANY OF PUERTO RICO,

Plaintiffs, Appellants,

v.

XL SPECIALTY INSURANCE CO., AXIS REINSURANCE CO.,
AND HARTFORD FIRE INSURANCE CO.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Robert T. Smith, with whom Rajesh R. Srinivasan, Michael I. Verde, David L. Goldberg, Philip A. Nemecek, Tenley Mochizuki, Katten Muchin Rosenman LLP, Jaime E. Toro-Monserrate, Nayda I. Pérez-Román, and Toro, Colón, Mullet Rivera & Sifre PSC were on brief, for appellants.
Cara Tseng Duffield, with whom Karen L. Toto, Kimberly M. Melvin, John E. Howell, and Wiley Rein LLP were on brief, for appellee XL Specialty Insurance Company.
Francisco E. Colón-Ramírez and Colón Ramírez LLC on brief, for appellees XL Specialty Insurance Company, AXIS Reinsurance Company and Hartford Fire Insurance Company.
Joshua D. Weinberg and Shipman & Goodwin LLP on brief, for appellee Hartford Fire Insurance Company.

Michael R. Goodstein, James M. Young, and Bailey Cavalieri LLC on brief, for appellee AXIS Reinsurance Company.

July 3, 2019

**TORRUELLA**, **Circuit Judge**.  In this case, titans of their respective industries clash as to the interpretation of an exclusion clause in an insurance policy representing millions of dollars in potential coverage.  In the process of deciding this appeal, we are granted a glimpse into the ethics that apparently prevail in some sectors of the financial industry.

Appellants UBS Trust Company ("UBS-Trust") and UBS Financial Services Inc. of Puerto Rico ("UBS-PR") filed suit against their primary insurance provider, XL Specialty Co. ("XL"), as well as their secondary insurance providers, claiming that the insurers' refusal to cover certain legal disputes constituted a breach of their insurance contract.  XL argues that those disputes fall under a "specific litigation exclusion" clause in the insurance policy that excepts from coverage claims related to prior matters specified therein.  UBS-Trust and UBS-PR (collectively, "UBS"), on the other hand, assert that the specified prior matters and the disputed matters at issue in this case are not sufficiently related and XL is misinterpreting the scope of the exclusion.

After the parties filed cross-motions for summary judgment, the district court held that the prior and disputed matters were sufficiently related such that the exclusion clause applied, and granted summary judgment in favor of the insurers.  UBS appealed.  After careful review, we affirm, finding that the

clear and unambiguous language of the specific litigation exclusion bars coverage of the disputed litigation matters here.

## I. Background

**A. Factual Background**

UBS-PR was an underwriter for various tax-exempt Puerto Rican municipal bonds.[1] UBS-PR, also a licensed broker-dealer, sold shares of closed-end funds ("CEFs") to brokerage customers in Puerto Rico.[2] UBS-Trust, on the other hand, was responsible for managing or co-managing twenty-three CEFs. From 2009 to 2012, UBS was the subject of various proceedings concerning the CEFs, two of which are relevant here: (1) a 2009 Securities and Exchange

---

[1] "[A]n underwriter buys bonds from an issuer and resells them to investors, with the difference between the purchase price paid by the underwriter to the issuer and the resale price accounting for the underwriter's profit or loss . . . ." Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of P.R., 704 F.3d 155, 160 (1st Cir. 2013).

[2] Typically, a closed-end fund is "[a] mutual fund having a fixed number of shares that are traded on a major securities exchange or an over-the-counter market." Unión de Empleados, 704 F.3d at 160 n.2 (citing Black's Law Dictionary 1116 (9th ed. 2009)). While closed-end funds generally fall under the purview of the Investment Company Act of 1940, "the funds [at issue] are exempt from the . . . Act under section 6(a)(1), which provides an exemption for certain funds organized in Puerto Rico, so long as [they] are sold only to residents in Puerto Rico." Id. at 160; see also 15 U.S.C. § 80a-6(a)(1). Hence, "the pool of potential buyers for these funds is smaller than the pool available to a typical large, closed-end mutual fund." Unión de Empleados, 704 F.3d at 160. Indeed, "[t]he CEFs are not traded on an exchange or quoted on any quotation service, and are available only to Puerto Rico residents."

-4-

Commission ("SEC") investigation, and (2) a 2010 lawsuit filed by CEF investors (collectively, the "Prior Matters").

## 1. 2009 SEC Investigation

In August 2009, the SEC began investigating UBS-PR for violations of securities laws (the "2009 SEC Investigation"). The SEC ultimately concluded that UBS-PR misrepresented the risks associated with its CEF shares. Although UBS-PR told customers that the share price was determined by supply and demand, the investigation concluded that UBS-PR was effectively setting the price of shares by controlling sales in the secondary market. In addition, the SEC found that by not informing investors it purchased millions of dollars of CEF shares into its inventory, UBS-PR made CEF shares appear more liquid and in higher demand than they actually were. The SEC further concluded that UBS-PR offloaded shares it owned by selling them at lower prices while "numerous UBS PR customers were also attempting to sell their holdings[,] . . . effectively prevent[ing] certain customers from selling their CEF shares." Ultimately, UBS-PR settled with the SEC through the entry of an "Order Instituting Administrative and Cease-and-Desist Proceedings," in which UBS-PR agreed to pay over $26 million in disgorgement, prejudgment interest, and civil money penalties.

### 2. 2010 *Unión* Lawsuit

In 2010, CEF investors filed a lawsuit concerning UBS's management of four CEFs, derivatively on behalf of the four funds and directly as a putative class of fund investors (the "2010 Unión Lawsuit"). See Verified Shareholder Derivative Action and Class Action Complaint, Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS Fin. Servs. of P.R., No. 10-1141-ADC (D.P.R. Mar. 31, 2011) (ECF No. 1). The CEFs incorporated pension bonds issued by Puerto Rico's Employee Retirement System ("ERS"), which were underwritten by UBS-PR and purchased by UBS-Trust. The investors alleged that: (1) in 2007, UBS-PR became financial advisor to the ERS; (2) afterwards, it served as underwriter when ERS sold $2.9 billion in pension bonds, which resulted in approximately $27 million in fees for UBS-PR and its co-underwriters; (3) ERS pension bonds were rated just one step above junk by Moody's Investors Service and other rating agencies; (4) UBS-Trust purchased more than half of the total bond offering; and (5) "near-junk" ERS bonds were concentrated in the four CEFs at issue, creating an over-concentration of low-quality ERS bonds.

Hence, plaintiffs claimed that UBS, "[o]perating on all sides of mutual fund and bond transactions . . . manipulated the [CEF] Funds and the bond market to the detriment of the Funds and its unsuspecting investors." They alleged that by serving as

-6-

"investment advisor, bond underwriter, and mutual fund manager," UBS's actions "created a disabling conflict of interest which caused [it] . . . to breach [its] fiduciary and other duties to the Funds." They further alleged that UBS caused "millions of dollars in . . . losses which [were] exacerbated . . . [by] the illiquidity of the market for the Funds, which [was] in large part controlled by [UBS]." To that end, investors claimed UBS engaged in "material misstatements and fraudulent omissions," including the withholding of information that demand was created through large-scale purchases of ERS bonds, thereby "artificially inflat[ing]" the price and masking the bonds' substantial risk. As a result, investors claimed UBS used the CEFs as a "dumping ground for the toxic pension bonds . . . in order to maximize the [bonds'] offering price."

### 3. The Insurance Policies

In 2011, UBS began searching for a new insurance provider to cover legal disputes. UBS's broker, Marsh, approached XL for primary coverage and Axis Reinsurance ("Axis") and Hartford Fire Insurance ("Hartford") (collectively, "Insurers") for secondary coverage. UBS negotiated the terms of the policies with the advice of Marsh and coverage counsel, Covington & Burling LLP. In the process, UBS requested numerous changes to the policy language proposed by XL. While XL agreed to many of UBS's requested changes,

-7-

it did not agree to alter the terms of a specific litigation exclusion. Ultimately, XL issued a primary $10 million policy, Axis issued a $5 million first excess policy, and Hartford issued a $5 million second excess policy in UBS's favor. The primary and secondary policies (together, the "Policy") shared most terms and conditions, including a specific litigation exclusion. The exclusion precluded coverage of:

> any Claim in connection with any proceeding set forth below, or in connection with any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, <u>or in any way</u> involving any such proceeding or any <u>fact, circumstance or situation</u> underlying or alleged therein:
>
> . . .
>
> <u>Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan, et al.</u> v. <u>UBS Financial Services Incorporated of Puerto Rico, et al.</u>, Case No. 10-1141, U.S. District Court, District of Puerto Rico.
>
> The [2009] investigation by the Securities and Exchange Commission captioned "in the Matter of UBS (Certain Puerto Rico Bonds and Funds)" SEC File No. FL-3491.

(the "Specific Litigation Exclusion") (emphasis added). Hence, if a new claim was related to either the 2009 SEC Investigation or the 2010 <u>Unión</u> Lawsuit as described in the clause above, it was not covered by the Policy. Crucially, during negotiations, UBS attempted to narrow the scope of the Specific Litigation Exclusion, but XL rejected the proposed changes. Specifically, UBS sought to replace "any fact, circumstance or situation underlying or

-8-

alleged therein" with "the same Wrongful Acts alleged in any such proceeding," and to remove the phrase "in any way."

Generally, the Policy protected UBS against claims alleging wrongful acts made during the policy period.[3] A "claim" included any "written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act," any "proceeding in a court of law or equity," or "any formal, civil, criminal, administrative, or regulatory investigation of an Insured." Moreover, a "wrongful act" was "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty . . . committed by [UBS] in the performance of, or failure to perform, Professional Services." "Professional services" meant "financial, economic or investment advice given or investment management services performed for others for a fee or commission by [UBS]."

In addition, the Policy included a "notice of claim endorsement" that required written notice of any claim "as soon as practicable after it is first made . . . but in no event later than ninety (90) days after the expiration of the Policy Period." Lastly, the Policy contained an "interrelated claims" provision

_____

[3] The policy period extended from January 15, 2013 through January 25, 2014.

mandating that all claims resulting from interrelated wrongful acts constitute a single claim.

### 4. Legal Disputes Since 2012

Since the beginning of the policy period, UBS has litigated, as pertinent here, two civil actions (the "Casasnovas" and "Fernández" Litigations), two regulatory investigations (by the SEC and the Financial Institutions Regulatory Association ("FINRA")), and hundreds of FINRA arbitrations (collectively, the "Disputed Matters"). UBS contends that the financial crisis in the Puerto Rico bond market catalyzed litigation against it.

### a. 2013 SEC Investigation

In October 2013, the SEC issued an order directing an investigation of the conduct of a former UBS sales manager, Jorge G. Ramírez, Jr. (the "2013 SEC Investigation"). The order expressly referred to the 2009 SEC Investigation and its result. It further asserted that UBS-PR

> may have been . . . making false statements of material fact or failing to disclose material facts to customers concerning, among other things, the risks or suitability of investing in mutual funds or [PR bonds] using margin, loans provided by [a] UBS [affiliate], repurchase agreements or other means of credit.

Ultimately, the SEC found that Ramírez "effected a scheme" whereby customers were encouraged to use existing CEF shares as collateral for loans, the proceeds of which were used to

purchase additional shares in the CEFs.  Consequently, by making

"material misrepresentations . . . regarding the safety of this

strategy," customers were exposed to "greater risk[s] than they

otherwise would have been exposed."  The SEC concluded that UBS

did not provide reasonable supervision as required under the

Securities Exchange Act.  The matter was resolved when UBS paid

$15 million in disgorgement and penalties.[4]

### b.  Casasnovas Litigation[5]

In February 2014, CEF investors filed a derivative suit

against UBS alleging it mismanaged the CEFs by not diversifying

and instead using them as a dumping ground for the municipal bonds

they underwrote.  Moreover, they claimed that UBS engaged in gross

conflicts of interest by acting as bond underwriter, investment

adviser, and mutual fund manager.  The Casasnovas plaintiffs also

alleged that UBS encouraged customers to purchase additional CEF

shares with loans collateralized by shares of the same fund,

thereby artificially increasing the demand, value, and liquidity

of the CEF shares.  They further claimed that they felt "trapped"

---

[4]  The record does not show whether those involved in the various fraudulent and nefarious activities engaged in by UBS and its agents were the subject of criminal investigation and/or charges.

[5]  Casasnovas-Balado v. UBS Fin. Servs. Inc., No. 2014-0072, 2015 WL 5179147 (P.R. Cir. Feb. 5, 2014) before the Commonwealth of Puerto Rico Court of First Instance, Superior Court of San Juan.

by the "illiquidity of the market created by" UBS, and that UBS's "manipulative trading, which was concealed . . . by the UBS Defendants . . . destroyed the [CEF's] overall financial health."

### c. **Fernández** Litigation

In May 2014, another group of CEF investors sued UBS in the U.S. District Court for the Southern District of New York and voluntarily withdrew the complaint less than a month later. Fernández v. UBS AG, 222 F. Supp. 3d 358, 369 (S.D.N.Y. 2016). The investors eventually refiled "on behalf of themselves and a Class . . . of similarly situated persons who were and/or are invested in one or more of twenty-three (23) closed-end mutual funds." Amended Class Action Complaint, Fernández v. UBS AG, No. 15-2859-SHS (S.D.N.Y. May 8, 2015) (ECF No. 68). In their amended complaint, the Fernández plaintiffs alleged that UBS steered them into making "high-risk, volatile investments" in CEFs. Specifically, they claimed the CEFs were not safe, despite UBS's representations to the contrary, since the funds were highly leveraged and invested in millions of dollars of debt securities. Moreover, the Fernández plaintiffs complained that UBS secretly offloaded a "substantial portion of its own inventory of shares" by "push[ing]" them on UBS clients. As a result, UBS assumed "conflict[ing] roles" by underwriting municipal bonds, selling them into the CEFs, and acting as advisors to the CEFs. Because

UBS failed to mitigate risks and employed an "improper loan scheme," the Fernández class members alleged that they suffered significant losses after CEF shares plummeted in value.

Significantly, in June 2015, UBS filed a motion to dismiss, arguing that the Fernández litigation was time-barred because the Unión lawsuit filed in 2010 made "similar allegations" and was widely publicized, so should have put plaintiffs on notice of their claims.  In December 2016, the district court granted in part and denied in part UBS's motion to dismiss, concluding that "[t]he publicized lawsuits and administrative proceedings . . . [were] sufficient for the court to find that UBS investors had constructive notice and knowledge of their tort claims against UBS."  Fernández v. UBS AG, 222 F. Supp. 3d 358, 383 (S.D.N.Y. 2016).

### d.  2014 FINRA Investigation

In February 2014, FINRA's Enforcement Department notified UBS that it was under investigation.[6]  UBS ultimately paid $18,478,402 to settle with FINRA.  The settlement document, titled "Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent" (the "Settlement Letter"), discussed the 2009 SEC Investigation in the "Relevant Disciplinary

---

[6]  FINRA regulates UBS-PR only in its capacity as a broker-dealer.

History" section. The Settlement Letter concluded that UBS "failed to establish and maintain a supervisory system" that would ensure "the suitability of transactions in CEFs . . . in light of customers' risk objectives and profile." It highlighted that since customer accounts were concentrated in CEF shares, they "bore increased risk," which was "exacerbated by the fact that the CEFs were internally leveraged." It further indicated that as a result of the Puerto Rico bond market crash of 2013, customers who had invested heavily in the CEFs were forced to sell their funds "into an illiquid market at significant losses."

### e.  FINRA Arbitrations

UBS notified XL of fifty-five different FINRA arbitrations. The arbitration claims largely asserted that the CEFs were unsuitable investments because they were highly leveraged in risky municipal bonds. Moreover, investors claimed they were exposed to undue risk since UBS controlled the secondary market for the funds and misled investors by artificially increasing the demand for and liquidity of the shares. Notably, many of the claimants referred to the 2009 SEC investigation and resulting order. UBS was also served with approximately 1,150 additional arbitration proceedings,[7] which, according to UBS's

---

[7]  Eighty-four FINRA arbitrations (fourteen arbitrations in which XL was notified and seventy additional proceedings) were given to

-14-

First Amended Complaint, "asserted claims substantively similar or identical to those . . . in the [fifty-five other FINRA arbitrations reported to XL]."

### 5.  Notice of Claims

In October 2013, UBS notified XL of expected litigation and FINRA arbitrations involving allegations that customers were "overconcentrated" in CEFs, and that UBS made "unsuitable recommendations" promoting the use of CEF shares as "collateral for credit lines" and "misrepresentations" regarding the risks associated with investing in CEFs.  XL denied coverage on December 2, 2013, citing the Specific Litigation Exclusion.  UBS then notified XL about the FINRA arbitrations, the 2013 SEC investigation, and the Casasnovas Litigation.  XL also denied coverage because the proceedings "involved alleged misconduct in connection with CEFs and [municipal] bonds" and, therefore, was excluded.  Lastly, UBS notified XL about the Fernández Litigation, and, once again, XL refused to extend coverage.  UBS did not notify the Insurers of the 2014 FINRA Investigation or the additional FINRA arbitrations before filing this case in the district court.

---

the district court as a "sample set."

## B. Procedural Background

On December 18, 2015, UBS filed suit against the Insurers for breach of contract. In its First Amended Complaint filed on September 13, 2016, UBS alleged that the Insurers breached their contractual duty under the Policy to reimburse UBS for defense costs incurred in connection with the Disputed Matters. On July 28, 2017, the parties filed cross-motions for summary judgment. The Insurers pressed that the Disputed Matters were excluded from coverage because they were sufficiently related to the Prior Matters, and various Disputed Matters arose after the policy period ended. UBS countered that the Insurers were incorrectly interpreting the Specific Litigation Exclusion clause too broadly, and that the Disputed Matters that arose after the policy period were nevertheless covered because they were "interrelated" with claims that arose during the policy period. The district court granted summary judgment in favor of the Insurers and dismissed UBS's claims with prejudice. UBS Fin. Servs. Inc. of Puerto Rico v. XL Specialty Ins. Co., 289 F. Supp. 3d 335, 350 (D.P.R. 2018).

On appeal, UBS argues that: (1) the Disputed Matters are not excludable based on a plain reading of the Policy's unambiguous language; (2) pursuant to Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 499 (1st Cir. 2005), the exclusion only applies when there is

"substantial overlap" of relevant facts between the Prior and Disputed Matters; and (3) XL was required to cover defense-related expenses when there was a "remote possibility of coverage." In addition, UBS asserts that it complied with the Policy's notice requirements and that certain Disputed Matters not claimed within the policy period[8] are coverable because they are interrelated with claims made during the policy period.

XL counters that the Specific Litigation Exclusion's plain text unambiguously applies to any fact, circumstance, or situation underscored in the Prior Matters, and as such, the district court was correct in finding the clause barred coverage for the Disputed Matters. XL highlights that UBS was aware of the nature of the policy, as both sides heavily negotiated the terms, including the language of the Specific Litigation Exclusion. Moreover, XL asserts that it does not have to cover defense-related expenses, as the district court resolved that UBS was not entitled to coverage, so there is no "remote possibility of coverage." Regarding the Disputed Matters that originated after the policy period ended, XL posits that if they were interrelated to the Prior Matters, as UBS alleges, then they would nevertheless be excluded under the Specific Litigation Exclusion.

---

[8] The only Disputed Matters claimed within the Policy Period were the 2013 SEC Investigation and fourteen FINRA arbitrations.

## II. **Analysis**

We go directly to the language of the Specific Litigation Exclusion to determine whether the Disputed Matters are included in the Policy's coverage. "The interpretation of an insurance policy is a question of law for the court." Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012). "We thus must independently determine the construction of the policy." Raytheon, 426 F.3d at 497.

## A. **Construction of the Policy**

Under Puerto Rico law, applicable in this diversity case, the terms of insurance contracts "should be generally understood within their most common and usual meaning." Pagán Caraballo v. Silva Delgado, 22 P.R. Offic. Trans. 96, 101 (1988) (quoting Morales Garay v. Roldán Coss, 10 P.R. Offic. Trans. 909, 916 (1981)). Furthermore, "[w]here the Insurance Code fails to provide an interpretative approach for a given situation, we also may turn to the [Puerto Rico] Civil Code as a supplemental source of law." López & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64 (1st Cir. 2012) (citing Nieves v. Intercontinental Life Ins. Co. of P.R., 964 F.2d 60, 63 (1st Cir. 1992)).

"More than any other bilateral contract, [insurance contracts] are subject to the influence and modification produced on the text by the intention and purpose of the parties."

-18-

Rodríguez de Oller v. Transamerica Occidental Life Ins. Co., 171 D.P.R. 193 (2007), 2007 WL 1723369 at *4 (Official Translation). Nevertheless, when "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." Lind-Hernández v. Hosp. Episcopal San Lucas Guayama, 898 F.3d 99, 104 (1st Cir. 2018) (citing P.R. Laws Ann. tit. 31, § 3471). In the present case we have both the language of the contract, which all parties agree is unambiguous, and the equally clear intention of the parties as demonstrated by the negotiations that preceded the ultimate agreement during which the insurers rejected the proposed modification of the language in question, to aid us in interpreting this controversy.

The Specific Litigation Exclusion states that no coverage will be available "in connection with any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving [the Prior Matters] or any fact, circumstance or situation underlying or alleged therein." In accordance with the most common and usual meaning of these terms, we find that if a "claim . . . in any way involv[es]" a "fact, circumstance, or situation" that was "alleged" in a Prior Matter, that claim is clearly excluded from coverage. The terms "as set forth in the policy" are broad and do not require that the

-19-

overlap be substantial. See AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 4, 10 (1st Cir. 2015) (citing P.R. Laws Ann. tit. 26, § 101) (rejecting textual arguments that would steer the court away from interpreting unambiguous provisions of an insurance contract as they are written).

Although the language is undoubtedly broad, it was the language UBS bargained for. Indeed, as previously alluded to, during negotiations UBS attempted to narrow the scope of the Specific Litigation Exclusion, but XL rejected the proposed changes. Specifically, UBS sought to replace "any fact, circumstance or situation underlying or alleged therein" with "the same Wrongful Acts alleged in any such proceeding," and to remove the phrase "in any way." Aware of the breadth of the unchanged exclusion, UBS nevertheless agreed to purchase the Policy as it read. Therefore, we see no reason to depart from the negotiated plain text of the provision.

UBS disagrees, insisting that pursuant to Raytheon, 426 F.3d 491, we should require "substantial" overlap between the Prior and Disputed Matters, and that the district court's construction of the exclusion would render the Policy illusory because any claim connected to CEFs, which are a "core business" of UBS, would be excluded. Moreover, UBS asserts that the clause does not call for exclusion on a proceeding-to-proceeding or complaint-to-complaint

-20-

basis, but rather an "act-to-act" basis. According to UBS, this would allow a portion of a proceeding filed against UBS to be excluded but the rest to be covered. Although ingenious, we find these arguments unsupported by the parties' intent as set forth in the terms of the Policy and the preceding negotiations.

UBS asserts that, pursuant to Raytheon, the Specific Litigation Exclusion only applies if there is a "substantial" overlap between the Prior and the Disputed Matters. We disagree, convinced not only by the facts of this case previously summarized but also by a comparison of the language in the present Policy with that in Raytheon. The policy in Raytheon provided an exclusion for

> any Claim made against any Insured . . . based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured, on or prior to [September 15, 2000], or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

Raytheon, 426 F.3d at 495 (emphasis added). Based on this language, the Court found the policy required "the allegations in the second complaint [to] find substantial support in the first complaint, i.e. that the allegations of the second complaint substantially overlap those of the first." Id. at 499. While at first glance, the Raytheon clause looks similar to the one at issue here, we find two key differences.

First, and most critically, the <u>Raytheon</u> policy required the second claim to be "based on," "arising from," or "in consequence of" a "fact, circumstance or situation" of the prior litigation. <u>Id.</u> at 495. The <u>Raytheon</u> policy lacked the "<u>in any way involving</u>" connector, which is present in UBS's Policy and significantly broadens the scope of the exclusion. The <u>Raytheon</u> court so acknowledged in distinguishing a Third Circuit case: "the clause at issue [in <u>Bensalem Twp.</u> v. <u>Int'l Surplus Lines Ins. Co.</u>, 38 F.3d 1303, 1305 (3d Cir. 1994)] was broader because it excluded subsequent claims 'in any way involving' the prior claim." <u>Raytheon</u>, 426 F.3d at 499 n.7. And this Circuit has recognized that the phrase "in any way involving" should be expansively read. Specifically, in <u>Clark Sch. for Creative Learning, Inc.</u> v. <u>Philadelphia Indemnity Ins. Co.</u>, 734 F.3d 51, 56 (1st Cir. 2013), we held applying Massachusetts law that "[t]he 'or in any way involving' clause is a 'mop-up' clause intended to exclude anything not already excluded."

Second, the clause at issue here excludes "any Claim . . . in any way involving . . . <u>any</u> fact, circumstance or situation underlying or alleged" in the Prior Matters, while the <u>Raytheon</u> clause added the limiting phrase "<u>the same or any substantially similar</u>" before the terms "fact, circumstance or situation." <u>Raytheon</u>, 426 F.3d at 495 (emphasis added). Not only

-22-

did this phrase further limit the <u>Raytheon</u> clause's scope in comparison to the exclusion clause here, it also provided a textual basis for the "substantial overlap" standard applied in that case. <u>Id.</u> at 500 (holding that the exclusion, which barred coverage for "subsequent claim[s] 'based upon . . . the same or any substantially similar fact, circumstance or situation underlying or alleged' in a prior claim," required "substantial overlap" with the prior matter).[9]

Nevertheless, despite the admittedly broad scope of the Specific Litigation Exclusion, it is limited in important ways. The <u>Raytheon</u> exclusion clause mandated exclusion when a new suit was related to any pending or prior litigation, specifically, to "any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured, on or prior to [September 15,

_____

[9] In "Appellants' Response to Appellees' Rule 28(j) letter Regarding <u>BioChemics, Inc.</u> v. <u>AXIS Reinsurance Company</u>, No. 17-2059 (1st Cir.)," UBS posits that "<u>BioChemics</u> is harmful to Insurers' position, because it applied <u>Raytheon's</u> 'substantial overlap' test." Yet in <u>BioChemics</u>, the court did not grapple with the issue, noting that "the appellants <u>appear to accept</u> that the 'substantial overlap' test . . . is also the test that we should use to determine whether the Policy's requirement that 'Interrelated Wrongful Acts' share a 'common nexus' has been met." <u>BioChemics, Inc.</u> v. <u>Axis Reinsurance Co.</u>, 924 F.3d 633, 646 (1st Cir. 2019) (emphasis added). Not only was the <u>BioChemics</u> court evaluating a different contractual provision, it merely assumed, pursuant to the parties' arguments, that the 'substantial overlap' test was applicable. Thus, we find that <u>BioChemics</u> is neither binding nor persuasive for purposes of the matter at issue here.

-23-

2000]." Raytheon, 426 F.3d at 495. UBS's Policy, however, mandates exclusion when the new suit is related, not to any previous suit, but rather to five specific proceedings, including the 2009 SEC Investigation and the 2010 Unión Lawsuit.

Thus, as the Insurers have argued, the Specific Litigation Exclusion, although expansive, does not bar coverage for all claims, such as "claims for breach of fiduciary duties due to accounting errors, alleged self-dealing, failure to protect confidential customer account information from disclosure, whistleblower [c]laims," or claims for "deficient investment advisory services provided to the open-end funds [as opposed to CEFs]." UBS itself stated that CEFs were a "core business," and therefore that a "substantial portion of UBS's business was excluded from coverage," but it did not allege or show that CEFs were UBS's sole business, or that the exclusion as interpreted here would in effect vitiate all coverage. See B & T Masonry Const. Co. v. Public Serv. Mut. Ins. Co., 382 F.3d 36, 41 (1st Cir. 2004) ("While the[] exclusions do limit liability, they do not completely vitiate the bargained-for coverage . . . ."). Hence, we cannot say that the Specific Litigation Exclusion renders the policy illusory.[10]

_____

[10] In its Reply brief, UBS posits that the Insurers' interpretation of the exclusion would render it illusory "because, under their interpretation, the mere presence of UBS . . . would bar coverage."

-24-

Next, we address UBS's argument that the Specific Litigation Exclusion does not bar coverage for entire "claims" or proceedings, "only those portions [of the claims] with the requisite nexus to the Prior Matters." The Policy defines a "claim" as:

> (1) any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act;
>
> (2) any civil proceeding in a court of law or equity, or arbitration; or
>
> (3) any criminal proceeding which is commenced by the return of an indictment.[11]

_____

But the Insurers do not argue that UBS's inclusion as a party in a proceeding would automatically render the proceeding excluded. Indeed, they present various alternate scenarios in which UBS would be entitled to coverage despite its presence in a proceeding. If the mere inclusion of UBS as a litigating/arbitrating entity would activate the exclusion, then the policy would indeed be rendered meaningless and illusory. And we see no reason why UBS would seek out liability insurance of that nature, or why we should construct the clause to be even broader in scope than what the Insurers posit. Therefore, we decline to construct the policy in such a way, as "when the parties enter into a contract they do so to make their covenants and agreements effective, and not seeking illusory or empty declarations." Caguas Plumbing v. Cont'l Const. Corp., 155 D.P.R. 744, 753 (2001) (quoting Morales Garay, 101 D.P.R. at 707).

[11] The definition of "claim" was amended to include:

> (1) any formal, civil, criminal, administrative, or regulatory investigation of an Insured which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such Insured as a person or entity against whom a proceeding . . . may be commenced, including any "Wells," "Target Letter"

-25-

UBS posits that the first prong, "any written notice received . . . for a Wrongful Act" provides support for an "act-to-act" approach, and that the district court erroneously construed "claim" to mean "any civil proceeding," while ignoring the definition's first prong.  Further, UBS contends that the Policy's allocation clause supports its argument, as it expressly provides for partial coverage.  XL, to the contrary, draws our attention to the second prong, and argues that the Policy unambiguously excludes coverage for "any civil proceeding . . . or arbitration," not "portion[s] of a loss" or "wrongful acts," as UBS wants us to interpret it.

XL has the better argument.  If the definition of a "claim" only included the first prong, UBS's interpretation might have better traction.  UBS, however, fails to take into account the entire definition and the disjunctive use of the word "or." The word "or" indicates an item is separate from others in a list. See Clark Sch. for Creative Learning, 734 F.3d at 56 (so noting).

---

or other notice from the Securities and Exchange Commission or a similar state or foreign governmental authority that describes actual or alleged violations of securities or other laws by such Insured Person; and

(2) service of a subpoena upon an Insured in connection with a regulatory investigation of any Insured.

And while the Policy's definition for "claim" includes "any written notice . . . that any person or entity intends to hold any Insured responsible for a Wrongful Act," it also includes "any civil proceeding . . . or arbitration," "any criminal proceeding," or "any formal, civil, criminal, administrative, or regulatory investigation."  We see no reason why we should read a single subpart defining a "claim" as a "written notice" to mean that claims should be divided into multiple fractions for purposes of applying the Specific Litigation Exclusion.  Moreover, we do not see why the first prong should govern instead of the more pertinent ones regarding civil proceedings, arbitrations, or investigations.  If we were to adopt UBS's construction, the other prongs would be rendered superfluous, and we refuse to construe the definition of "claim" in a way that would make two-thirds of it meaningless.  See In re Advanced Cellular Sys., Inc., 483 F.3d 7, 12 (1st Cir. 2007) (noting that "courts should avoid interpretations that render a provision of an agreement surplusage").

UBS's argument for an "act-to-act" approach based on the Policy's allocation clause also fails.  That clause states:

> If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim made against the Insured contains both covered and uncovered matters, or because a Claim is made against both the Insured and others not insured under this Policy, the Insured and the Insurer will use their best efforts to determine a fair and appropriate allocation of Loss between that portion of Loss that

-27-

> is covered under this Policy and that portion of loss
> that is not covered under this Policy. . . .

Because the allocation clause permits the parsing of claims into covered and uncovered matters, it appears to be in tension with a claim-by-claim reading of the Specific Litigation Exclusion. Nevertheless, it is a well-known precept of contract interpretation in Puerto Rico law that specific provisions in a contract trump general provisions. P.R. Tel. Co. v. SprintCom, Inc., 662 F.3d 74, 96 (1st Cir. 2011); see also Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, S.E., 615 F.3d 45, 59 n.10 (1st Cir. 2010) (noting that when a general provision conflicts with a specific provision the latter is understood as a limitation on the former). To that end, we find that the Policy's definition of "Claim" is more specific in the context of determining that word's scope as used in the Specific Litigation Exclusion, and thus controls. Moreover, while the allocation clause explicitly creates a distinction between covered and uncovered matters within a "Claim" for purposes of allocation, the Specific Litigation Clause does not express an analogous distinction between excluded and non-excluded matters within a "Claim" for purposes of exclusion. Because the Specific Litigation Exclusion applies by its clear terms to entire "Claims" as these are defined by the Policy, we see no reason to depart from the clause's plain meaning.

Nevertheless, UBS maintains that the Specific Litigation Exclusion should be construed to mean something other than its plain language because Puerto Rico law requires exclusionary clauses in insurance contracts to be disfavored and strictly construed.

While it is true that insurance contracts are generally viewed as adhesion contracts under Puerto Rico law, requiring construction in favor of the insured, López & Medina Corp., 667 F.3d at 64, and that Puerto Rico's public policy disfavors exclusionary clauses and thus promotes their strict construction, Quiñones López v. Manzano Pozas, 1996 P.R.-Eng. 499,244, 141 D.P.R. 139, 155 (1996), those principles seek to protect a weaker party when there is disparity at the bargaining table. See Herrera v. First Nat'l City Bank, 3 P.R. Offic. Trans. 1004, 1009 (1975) (noting, in the context of adhesion contracts in general, that interpretation of an "obscure" clause should favor the "economically weaker [party who] . . . had nothing to do with its drafting"); see also Meléndez Piñero v. Levitt & Sons of Puerto Rico, Inc., 1991 P.R.-Eng. 735,848, 129 D.P.R. 521, 547 (1991) (noting that typically, "the terms of an insurance contract are not negotiated by the parties"). Yet those concerns are not present here, since the terms of the Specific Litigation Exclusion are clear, and the parties negotiated the Policy at arm's length.

UBS, a sophisticated financial player, engaged Marsh, "a large and respected broker with expertise in the Puerto Rican market," and together they negotiated the terms of the Policy. Moreover, UBS received advice and suggestions from Covington & Burling LLP concerning the Specific Litigation Exclusion. UBS therefore could have reasonably expected that it bargained for the plain reading construction we give the exclusion today.

Having determined the Specific Litigation Exclusion's construction and scope, the next step is to determine its applicability to the Disputed Matters. The district court examined the relationship between the Prior and Disputed Matters in detail, and ultimately concluded that the Specific Litigation Exclusion's expansive language precludes coverage of the Disputed Matters, as they "all involve facts, circumstances, or situations underlying the [P]rior [M]atters." Because the district court applied the exclusion as we have constructed it, we adopt its analysis and see no need to rehash it here.

**B. There is no "remote possibility of coverage"**

UBS nevertheless relies on W Holding Co. v. AIG Ins. Co., 748 F.3d 377, 384 (1st Cir. 2014), for the proposition that XL is required to cover defense expenses because there was a "remote possibility of coverage."

The district court rejected UBS's argument finding that the Insurers "[did] not assume UBS's defense under any circumstances" and that UBS had failed to distinguish the applicable standards related to an insurer's "duty to defend" and "duty to indemnify." On appeal, UBS clarifies that it is not asserting that the Insurers had a duty to defend, which involves appointing counsel and controlling the defense of the case, but rather that they had a "separate (but related)" duty to reimburse defense costs. See Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1170 (8th Cir. 2011) (noting distinction between duty to reimburse defense costs and duty to defend). The Insurers do not contest this characterization, so we need not delve into the differences between the two concepts.

W Holding Co. explained that under Puerto Rico law, when an insurance contract defines a covered loss to include defense costs, "an insurance company must advance defense costs if a complaint against an insured alleges claims that create even a 'remote possibility of coverage.'" W Holding Co., 748 F.3d at 384. Nevertheless, the procedural posture of that case was different to the one now before us, so we find it inapposite. There, the district court case had not moved past the motion to dismiss stage when directors and officers of a failed bank argued that they could not fund an effective defense without insurance

-31-

proceeds. They sought preliminary injunctive relief, requesting the court to order the primary insurer to advance their defense costs on an ongoing basis under the terms of a policy provision that required such funding. Id. at 380. The district court granted the advancement motion under a "remote possibility of coverage" standard. However, it expressly noted that the insurer could be entitled to repayment. Id. at 381. We affirmed, highlighting the procedural posture of the case and indicating that the insurer could "still 'win' the coverage war at a succeeding trial on the merits." Id. at 386 (quoting Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991))[12].

Meanwhile, the question on this summary judgment record is not whether UBS's complaint alleges claims that create a remote possibility of coverage, but whether UBS is actually entitled to coverage. And we confirm that it is not. Undeterred, UBS posits that an Eighth Circuit case, Liberty Mutual Ins. Co. v. Pella Corp., 650 F.3d 1161 (8th Cir. 2011), "did not arise on a preliminary injunction, but instead involved a final determination

---

[12] This court cited Cuadrado Rodríguez v. Fernández Rodríguez, 2007 WL 1577940, at *8 (P.R. App. Ct. Mar. 30, 2007), in which the Puerto Rico Court of Appeals similarly warned that if the trial court were to determine in its final sentence that the policy did not provide coverage for the proven facts of the case, then the party to whom the defense costs were advanced would have to return them as per the terms of the policy agreement.

of benefits under the policy at issue" and arrived at the outcome UBS seeks. But this rendition of <u>Liberty Mutual</u> is inaccurate, as the Eighth Circuit concluded there that the insurer had no duty to reimburse the insured's defense costs. <u>Id.</u> at 1176, 1178. Thus, we are not persuaded. In sum, because the court has already definitely decided that the Disputed Matters are not covered by the Policy's terms, UBS cannot show there is a "remote possibility of coverage."[13]

### III. Conclusion

Under the facts of this case and the law of Puerto Rico as applied to them, we must enforce the policy according to the terms agreed to by the parties to this appeal. <u>See</u> <u>López & Medina Corp.</u>, 667 F.3d at 69. We thus find that the Specific Litigation Exclusion bars coverage of the Disputed Matters, as they all involve "fact[s], circumstance[s], or situation[s]" alleged or underlying the 2009 SEC Investigation and the 2010 <u>Unión</u> Lawsuit.

For the foregoing reasons, we affirm. Costs granted to appellees.

**Affirmed.**

---

[13] Because we have already held that coverage for the Disputed Matters is barred by the Specific Litigation Exclusion, we need not reach the separate issues of whether the Disputed Matters were adequately notified and whether they can be deemed to have been made within the policy period.