# United States Court of Appeals
## For the First Circuit

_____

No. 99-2055

BRAZAS SPORTING ARMS, INC.,

Plaintiff, Appellant,

v.

AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY,

Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Lynch and Lipez, Circuit Judges.

_____

    John G. Bagley, with whom Egan, Flanagan and Cohen, P.C. was on
brief, for appellant.
    James F. Kavanaugh, Jr., with whom Conn, Kavanaugh, Rosenthal,
Peisch & Ford, L.L.P. was on brief, for appellee.

_____

July 13, 2000

_____

**TORRUELLA, Chief Judge.** This is primarily a declaratory judgment action in which a firearms distributor sought a determination that it was entitled to defense and/or indemnity from its insurance carrier under its general liability policies for civil actions brought by or on behalf of gunshot victims on a general theory that several firearm distributors had negligently, willfully, knowingly, and recklessly flooded the firearms market. The district court granted summary judgment in favor of the insurance carrier holding that the "products-completed operations hazard" exclusion provision applied to the civil actions, thereby precluding coverage. See Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 59 F. Supp. 2d 223, 225-26 (D. Mass. 1999). Because we agree with the district court's interpretation of the exclusion provision, and for the additional reasons discussed below, we affirm the grant of summary judgment.

## BACKGROUND

Between 1992 and 1997, appellee American Empire Surplus Lines Insurance Company, a Delaware corporation, issued three identical "commercial general liability" policies to appellant Brazas Sporting Arms, Inc., a Massachusetts corporation. Brazas's policies contained the following endorsement that altered the standard policy agreement: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard.'" Products-

completed operations hazard includes "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) Products that are still in your physical possession; or (2) Work that had not yet been completed or abandoned."  "Your product" is defined as,

> a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> (1) You;
>
> (2) Others trading under your name; or
>
> (3) A person or organization whose business or assets you have acquired . . . .
>
> . . .
>
> 'Your Product' includes:
>
> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'; and
>
> b. The providing of or failure to provide warnings or instructions."

"Your work" means:

> a.  Work or operations performed by you or on your behalf . . . .
>
> . . .
>
> 'Your work' includes:
>
> a. Warranties or representations made at any time with respect to the fairness, quality, durability, performance or use of 'your work'; and

b. The providing of or failure to provide warnings or instructions.

In 1995, Brazas discovered that it had been named as a defendant in litigation pending in the Eastern District of New York. It subsequently learned that it was named as a defendant in an additional law suit. Both lawsuits charged Brazas and various other manufacturers and dealers of handguns, as well as industry trade groups, with liability for contributing to market overflow. Specifically, the lawsuits alleged that:

> Defendants have knowingly produced and distributed handguns in excess of the reasonable demand by responsible consumers in the lawful national handgun market, and they have knowingly failed or refused to take any meaningful steps to regulate and control the distribution and sale of their guns by retail dealers. Their willfully negligent conduct - individually and as an industry - has created and supplied an unlawful national market in firearms, the source of the handguns that killed and wounded plaintiffs and their loved ones.

Notably, the lawsuits did not identify any particular guns sold by Brazas as the cause of injury to any particular plaintiffs. By the time the district court entered judgment, one of the cases had gone to trial, and Brazas had eventually been dismissed. See Hamilton v. Accu-Tek, No. C.V. 95-0049 (E.D.N.Y. 1995). Brazas has incurred in excess of $75,000 in defense costs in connection with the litigation.

At least some of the claims alleged in the lawsuits occurred during the effective period of the American Empire policies. However,

-4-

upon notice, American Empire denied coverage and refused to defend Brazas. As a result, Brazas brought this declaratory judgment action in the United States District Court for the District of Massachusetts under that court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Brazas also brought a claim under the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A, § 11. The parties filed cross motions for summary judgment. Brazas appeals from the district court's grant of summary judgment for American Empire and the denial of Brazas's motion for partial summary judgment on its duty to defend claim.

## DISCUSSION

### I. The Policy Coverage Claim

We review de novo the district court's interpretation of the insurance contracts. See Fed. R. Civ. P. 56; Merchants Ins. Co. of New Hampshire, Inc. v. United States Fidelity & Guar. Co., 143 F.3d 5, 6-8 (1st Cir. 1998); GRE Ins. Group v. Metropolitan Boston Hous. Partnership, Inc., 61 F.3d 79, 81 (1st Cir. 1995). Under Massachusetts law, we construe an insurance policy under the general rules of contract interpretation. See Merchants, 143 F.3d at 8 (citing Hakim v. Massachusetts Insurers' Insolvency Fund, 675 N.E.2d 1161, 1164 (Mass. 1997)). We begin with the actual language of the policies, given its plain and ordinary meaning. See GRE Ins. Group, 61 F.3d at 81 (citing cases). In so doing, we "consider 'what an objectively reasonable

insured, reading the relevant policy language, would expect to be covered.'" Id. (quoting Trustees of Tufts Univ. v. Commercial Union Ins. Co., 616 N.E.2d 68, 72 (Mass. 1993)).

As a liability insurer in Massachusetts, American Empire has a duty to defend Brazas if the allegations in the New York litigation are "reasonably susceptible" to an interpretation that they state a claim covered by Brazas's policy. Merchants, 143 F.3d at 8 (quoting New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co., 667 N.E.2d 295, 297 (Mass. App. Ct. 1996) (internal quotations omitted)); see also Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 18 (1st Cir. 1997) (quoting Sterilite Corp. v. Continental Cas. Co., 458 N.E.2d 338 (Mass. App. Ct. 1983)). Under Massachusetts law, the duty to defend is broader than, and independent of, the duty to indemnify. See Merchants, 143 F.3d at 8 (citing Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989)); Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997) (citing same). That is, the obligation to defend turns on the facts alleged in the complaint rather than the facts proven at trial. See Millipore, 115 F.3d at 35; see also GRE Ins. Group, 61 F.3d at 81.

A liability insurer has no duty to defend a claim that is specifically excluded from coverage, but the insurer bears the burden of establishing the applicability of any exclusion. See Mt. Airy, 127 F.3d at 19 (citing Great Southwest Fire Ins. Co. v. Hercules Bldg. &

-6-

Wrecking Co., 619 N.E.2d 353 (Mass. App. Ct. 1993)); GRE Ins. Group, 61 F.3d at 81 (citing Camp Dresser & McKee, Inc. v. Home Ins. Co., 568 N.E.2d 631, 633 (Mass. App. Ct. 1991)). Consistent with the Massachusetts general rule favoring insureds in policy interpretation, any ambiguities in the exclusion provision are strictly construed against the insurer. See Mt. Airy, 127 F.3d at 19 (citing Sterilite, 458 N.E.2d 338); GRE Ins. Group, 61 F.3d at 81; see also Hakim, 675 N.E.2d at 1165 (holding that "[t]his rule of construction applies with particular force to exclusionary provisions"). Ambiguity exists when the policy language is susceptible to more than one rational interpretation. See Merchants, 143 F.3d at 8 (citing Boston Symphony Orchestra, 545 N.E.2d at 1169); Mt. Airy, 127 F.3d at 19 (citing Jefferson Ins. Co. of New York v. Holyoke, 503 N.E.2d 474 (Mass. App. Ct. 1987)). But it does not follow that ambiguity exists solely because the parties disagree as to the provision's meaning. See Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 374 (1st Cir. 1991).

Before the district court, and on appeal, American Empire's position is that the products-completed operations hazard exclusion excludes coverage for all injuries arising from Brazas's products, off premises, regardless of the circumstances. Brazas contends that such a reading of the exclusion provision would render the general liability policy meaningless. Brazas challenged summary judgment on two grounds:

-7-

(1) the products-completed operations hazard exclusion was intended to apply to defective products only, and (2) the New York civil actions do not actually allege injuries from Brazas's products, but rather injuries caused by the company's business management and strategy, thereby rendering the exclusion provision inapplicable.

The district court rejected the appellant's arguments. The court held that the language of the exclusion provision did not support a reading that would limit the exclusion to injuries from defective products. Additionally, the court concluded that "[o]nly by a distortion of language and logic can plaintiff suggest that the injuries sued upon do not 'arise from' the distribution of Brazas products, off Brazas premises." Brazas, 59 F. Supp. 2d at 226. We take up each of the appellant's arguments in turn.

## A. Defective Products

The appellant posits that the "pivotal issue" of the case is "whether the exclusion is meant to bar more than product liability claims."[1] Appellant's Brief at 15. It suggests that in the scheme of

---

[1] The parties and the case law use the terms "products liability" and "defective products" interchangeably in the context of the products-completed operations hazard exclusion. However, these terms are not coterminous, and it is at least arguable that the New York law suits are a variety of a products liability action. Because such an understanding of products liability is antithetical to the appellant's argument, for purposes of this discussion, we will assume that the New York cases are not products liability actions. And to avoid further confusion, we will only use the term defective products for the remainder of this opinion.

the commercial general liability policy as a whole the general risks of doing business should be protected, and, therefore, the exclusion provision should be limited to defective products claims. Moreover, the appellant argues, a reasonable insured would interpret the provision as applying to defective products only.

Unfortunately, we have no guidance from Massachusetts courts on this issue. Indeed numerous other courts have read similar exclusion provisions to be defective products exclusions,[2] but there is contrary authority from courts finding such a reading to be beyond the text of the exclusion.[3]

---

[2] See, e.g., Scarborough v. Northern Assurance Co. of America, 718 F.2d 130, 136 (5th Cir. 1983) (negligent failure to warn); Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. Lyon, 528 S.W.2d 932, 934 (Ark. 1975) (negligent sale of gun powder to minors); McGinnis v. Fidelity & Cas. Co. of New York, 276 Cal. App. 2d 15, 17-18 (Cal. Ct. App. 1969) (negligent sale of gun powder to minors); ADA Resources v. Don Chamblin & Assocs., 361 So.2d 1339, 1343 (La. Ct. App. 1978) (sale of defective joint fits within exclusion provision); Lessak v. Metropolitan Cas. Ins. Co. of New York, 151 N.E.2d 730, 734-35 (Ohio 1958) (negligent sale of BB gun to minor); Hartford Mut. Ins. Co. v. Moorhead, 578 A.2d 492, 495-96 (Pa. Super. Ct. 1990) (negligent failure to warn); General Ins. Co. of America v. Crawford, 635 S.W.2d 98, 102 (Tenn. 1982) (negligent sale of products); Colony Ins. Co. v. H.R.K., Inc., 728 S.W.2d 848, 851 (Tex. App. 1987) (wrongful death action arising out of suicide with gun sold by insured).

[3] See, e.g., Cobbins v. General Accident Fire & Life Assurance Corp., 290 N.E.2d 873, 877 (Ill. 1972) (negligent sale of fireworks to minor); Pennsylvania Gen. Ins. Co. v. Kielon, 492 N.Y.S.2d 502, 503-04 (N.Y. App. Div. 1985) (negligent sale of gunpowder to minor).

We agree with the appellant that two of the cases upon which the district court and the appellee rely, Rhinebeck Bicycle Shop, Inc. v. Sterling Insurance Co., 546 N.Y.S.2d 499 (N.Y. App. Div. 1989), and New York Casualty Insurance Co. v. Halley Electric Co., 539 N.Y.S.2d 204,

We agree with the district court that the latter line of case law is more persuasive. First, we observe that many of the courts that have held that a products-completed operations hazard exclusion provision was, in effect, a defective products exclusion were considering provisions that contained materially different language from the provision in American Empire's policies. Second, and more significant, in order to limit the American Empire exclusion provision to defective products, we would need to read into the text a requirement that is simply not there. The products-completed operations hazard includes in plain and unambiguous language "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product.'" Where, as here, the language of the exclusion provision is unambiguous, the text should be given its plain meaning. In this case, the plain meaning of the exclusion is that it applies to all product-related injuries. See Cobbins, 290 N.E.2d at 877. Although we take into account the likely understanding of a reasonable insured, we may not read into the provision a condition or language that is not present. See Hakim, 675 N.E.2d at 1164-65. Nor are we sure that in the context of Brazas's

---

205 (N.Y. App. Div. 1989), are inapposite. In those cases, the plaintiffs alleged injuries that resulted from negligent assembly or manufacture -- i.e. defective products -- and therefore, the fact that those courts applied the product hazard exclusion under those circumstances sheds no light on the applicability of the provision to a negligent sale type of case.

actual business as a distributor, rather than a manufacturer, a reasonable insured would read the exclusion to refer to defective products. Consequently, we are convinced that the exclusion clause does not limit itself to injuries that arise out of defective products.

**B. "Arising out of"**

The second issue -- whether the New York civil actions state claims for injuries that "arise out of" Brazas products -- is a much closer case. We have before us Brazas, an insured who purchased a commercial general liability policy, arguably with the intent of covering the general risks of doing business. See Western Alliance Ins. Co. v. Gill, 686 N.E.2d 997, 1000-01 (Mass. 1997). However, an exclusion provision in the policy explicitly denies coverage for all injuries "arising out of" the insured's products, products which are inherently dangerous. Subsequently, a civil action is brought for wrongful injuries allegedly resulting from Brazas's saturation of the market with its products. However, the plaintiffs, who were directly injured by products from that market (or an underground market), through intervening intentional wrongdoing, do not claim that any of Brazas's products were involved in their specific injuries. We must therefore determine whether it is legally significant that the underlying civil action alleges that the injury was caused by the appellant's conduct and not the appellant's products.

-11-

On the one hand, Massachusetts case law instructs that the term "arising out of" should be broadly construed and additionally directs our attention to the source of the underlying injury rather than the theory of liability alleged in the complaint. See, e.g., Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 816-17 (Mass. 1999). On the other hand, at least some Massachusetts courts recognize a separate injury arising out of the insured's negligence independent of the proximate cause of harm, see, e.g., Worcester Mut. Ins. Co. v. Marnell, 496 N.E.2d 158, 161 (Mass. 1986), which taken together with Massachusetts general policy favoring insureds in interpreting insurance contracts, see GRE Ins. Group, 61 F.3d at 81, suggests a narrow reading of the exclusion provision. Traditional considerations, such as parties' expectations, see Western Alliance, 686 N.E.2d at 1000-01, shed no further light on the issue because neither party would have foreseen this type of lawsuit when they entered into the policy agreement.

Faced with these conflicting principles of construction, and in the absence of a definitive answer from Massachusetts courts, we focus our inquiry on the text of the exclusion provision. The products-completed operations hazard exclusion applies to "all 'bodily injury' . . . arising out of '[Brazas's] product.'" Under Massachusetts law, "arising out of" "indicates a wider range of causation than the concept of proximate causation in tort law."

-12-

Rischitelli v. Safety Ins. Co., 671 N.E.2d 1243, 1245 (Mass. 1996), quoted in Merchants, 143 F.3d at 9; see also Mt. Airy, 127 F.3d at 20; Bagley, 720 N.E.2d at 816.  In other words, it falls somewhere between proximate and "but for" causation -- an intermediate causation standard.  See Merchants, 143 F.3d at 9-10; Rischitelli, 671 N.E.2d at 1245; see also Bagley, 720 N.E.2d at 816 (observing that many cases interpret the term as much more analogous to "but for" causation).  It is generally understood to mean "originating from," "growing out of," "flowing from," "incident to," or "having connection with."  See Merchants, 143 F.3d at 9; Mt. Airy, 127 F.3d at 20; New England Mut. Life Ins. Co., 667 N.E.2d at 298 (citing Webster's Third New International Dictionary 117 (1981)); see also Continental Cas. Co. v. City of Richmond, 763 F.2d 1076, 1080 (9th Cir. 1985) (listing similar variations of "arising out of" to illustrate that phrase is broader than "caused by").

In interpreting the phrase "arising out of" in the context of the case at hand, we are compelled by Massachusetts law to consider the "source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint [of the underlying civil action]."  Bagley, 720 N.E.2d at 817 (quoting New England Mut. Life Ins. Co., 667 N.E.2d at 299).  Thus, in this case, firearms were the immediate source of the plaintiffs' injuries, and the fact that the plaintiffs, to reach the deep pockets of the

-13-

firearms industry, contrived a theory of liability that targeted Brazas for its alleged participation in flooding the firearms market cannot affect the application of the exclusion provision. See id. at 816-17; United Nat'l Ins. Co. v. Parish, 717 N.E.2d 1016, 1018-19 (Mass. App. Ct. 1999).

The appellant correctly asserts that under Massachusetts law an act of negligence can create a separate legal injury that does not arise out of the product. However, the primary cases upon which the appellant relies for this proposition, Rischitelli v. Safety Insurance Co., 671 N.E.2d 1243 (Mass. 1996), and Worcester Mutual Insurance Co. v. Marnell, 496 N.E.2d 158 (Mass. 1986), are readily distinguishable.

In Rischitelli, the plaintiff was the victim of road rage -- after a car accident, he was physically attacked by the driver of the other car. As an insured under a standard automobile insurance policy, the plaintiff sought to recover benefits. The policy afforded coverage for "'bodily injury . . . arising out of the ownership, maintenance or use of an auto.'" Rischitelli, 671 N.E.2d at 1245. Although the issue before the court related to policy coverage rather than to an exclusion provision, the court's construction of the expression "arising out of" is duly applicable to this case. The court recognized that the phrase did not "refer to all circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle." Id. Instead, it observed, cases fall along a continuum depending on the causal

-14-

connection between the injury and the automobile.  See id. at 1245.
For instance, under a standard auto policy there was no coverage when
a plaintiff tripped on a rope that fell off a truck or when a plaintiff
was shot by the insured while seated in his automobile, but the sexual
assault of a school bus passenger by the bus driver involved an injury
arising from the use of a motor vehicle.  See id. (citing Perry v.
Chipouras, 66 N.E.2d 361 (Mass. 1946), Sabatinelli v. Travelers Ins.
Co., 341 N.E.2d 880 (Mass. 1976), and Roe v. Lawn, 634 N.E.2d 117
(Mass. 1994)).  In these cases, the intervening act of violence broke
the chain of causation between the operation of the vehicles and the
injuries only where the violence was merely incidental to the use of
the vehicle.  Consequently, the Rischitelli court concluded that the
battery was sufficiently independent of the motor vehicle accident that
the losses the plaintiff sustained arose from the intentional
wrongdoing of the other driver and not from the use of an automobile.
See id. at 1246.

A variation of this independent causation analysis aided the
court in Worcester Mutual Insurance Co.  In that case, the underlying
complaint alleged that the insureds' negligent supervision of a party
held at their residence was the proximate cause of an automobile
accident that killed the plaintiff's intestate.  See 496 N.E.2d at 159.
The insureds sought coverage for the wrongful death action under their
homeowners' insurance policy, but the policy had an exclusion for

bodily injury arising out of the ownership or use of a motor vehicle. See id. The court concluded, however, that negligent supervision "is separate and distinct from the use or operation of an automobile." Id. at 161. The court reasoned that the allegations in the complaint, namely, that the insureds had failed to prevent their son from drinking, related solely to activities that took place in the home and that, therefore, the insureds could reasonably expect to be protected by their homeowner's policy. See id.

The court's reasoning in Worcester would at first glance seem to control the outcome in this case -- the New York civil actions accuse Brazas of making bad business decisions, conduct which takes place on Brazas's premises, and, therefore, Brazas could reasonably expect protection under its comprehensive general liability policy. However, unlike the circumstances in Worcester and Rischitelli, here the two sources of injury are interdependent. Brazas's alleged misconduct is the over-distribution of firearms and the proximate cause of the plaintiffs' injuries are firearms, whereas in Worcester, the parents' negligent supervision of their son derived from their illegal and unsupervised provision of alcohol, not the automobile that was ultimately the cause of the wrongful death. As the Worcester Court explained, alternatively, a claim for negligent entrustment (of the automobile), conduct which still occurred in the home, would necessarily have been within the exclusion provision. See id. at 245-

-16-

46. Similarly, in Rischitelli the battery and the car accident were separate and distinct events; the car accident merely preceded, and set the context for, the battery. In contrast, Brazas's conduct, along with the New York plaintiffs' claims, indisputably derived from firearms. In other words, the company, in distributing its firearms, is allegedly negligent precisely because it created the risk of the exact kind of injuries suffered by the New York plaintiffs. See United Nat'l Ins. Co., 717 N.E.2d at 1018-19; New England Mut. Life Ins. Co., 447 N.E.2d at 298-99; see also Continental Cas. Co., 763 F.2d at 1080-81.

Because the New York law suits concern off-premises conduct arising out of (not merely incidentally related to) firearms products, Brazas is not entitled to defense or indemnity coverage as a result of the products-completed operations hazard exclusion.

## II. Unfair Trade Practice Claim

This Court can quickly dispose of Brazas's additional claim that American Empire violated the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A, § 11, because it is nothing more than a reconfiguration of its coverage claim. Moreover, Brazas fails to direct the Court to any evidence that would create a genuine issue of fact to support this claim.

The Massachusetts consumer protection statute provides a right of action to anyone who suffered a loss of money or property as

a result of an unfair or deceptive business practice.  See Brown Daltas & Assocs. v. General Accident Ins. Co. of America, 844 F. Supp. 58, 67 (D. Mass. 1994), rev'd on other grounds, 48 F.3d 30 (1st Cir. 1995). It generally protects consumers from unfair business practices that are "immoral, unethical, oppressive, or unscrupulous; or within the bounds of some statutory, common-law or other established concept of unfairness."  Ellis v. Safety Ins. Co., 672 N.E.2d 979, 986 (Mass. App. Ct. 1996).

In this vein, Brazas contends that American Empire violated the Massachusetts law that established the rules of fairness as to an insurer's claims handling procedures, Mass. Gen. Laws ch. 176D, § 3(9)(a), (n), and thereby violated chapter 93A.  Specifically, the appellant charges American Empire with (1) misrepresenting pertinent policy provisions and (2) failing to provide a reasonable explanation of the basis for denial of coverage.  As an initial matter, a violation of chapter 176D is not automatically actionable under chapter 93A, § 11, which provides a cause of action for business plaintiffs injured by unfair trade practices.  See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 197 (Mass. 1993); cf. Mass. Gen. Laws ch. 93A, § 9(1) (establishing right of action for consumer plaintiffs for violations of ch. 176D, § 3(9)).  That said, conduct that violates ch. 176D may independently be an unfair trade practice actionable under ch. 93A, § 11.  See Kiewit Constr. Co. v. Westchester Fire Ins. Co., 878 F. Supp.

298, 301-02 (D. Mass. 1995). But we need not get distracted by the interrelationship of the two statutes because the appellant utterly fails to develop this claim.

At its core, the appellant's misrepresentation argument is that American Empire issued a policy called a "general liability" policy, which, based on the broad scope of the products-completed operations hazard exclusion, is in fact only a premises liability policy. Brazas does not allege, or point to any evidence, indicating that American Empire made any misrepresentations when it issued the policy, but argues only that the policy itself, in its own terms, misrepresents its coverage -- that is, a comprehensive liability policy would cover the New York civil actions because they arise from the general risks of doing business. Despite the appellant's claim to the contrary, this convoluted argument does not in itself create an issue of fact. We held above that the exclusion provision was not ambiguous and that, consequently, a reasonable insured would have understood that product-related injuries like those at issue in the New York civil actions would be excluded from coverage. Thus, as a matter of law the policies are not misleading.

The appellant's claim that American Empire violated chapter 176D because it did not provide a reasonable explanation for the denial of coverage is likewise unavailing. Again, Brazas does not point to any deficiency on the part of American Empire in its correspondence

-19-

with Brazas.  Instead, Brazas argues that the  explanation was inadequate because American Empire "chose to read the allegations in the underlying New York actions in the manner most favorable to its position." Appellant's Brief at 27.  Not only has the appellant failed to articulate a tenable theory under chapter 176D, § 3(9), without offering any legal support, but, more important, we have concluded that American Empire properly denied coverage and did not owe Brazas a duty to defend.  Where as here, the insurer properly denied coverage, there can be no violation of chapter 176D.  See <u>Spurlin</u> v. <u>Merchants Ins. Co. of New Hampshire</u>, 866 F. Supp. 57, 62 (D. Mass. 1994).

As the appellant has failed to persuade the Court that American Empire engaged in any conduct that rose to the level of unfairness as a matter of law, summary judgment was appropriate.  <u>See</u> <u>Brown Daltas & Assocs.</u>, 844 F. Supp. at 67-68.

## CONCLUSION

Because we conclude that the allegations raised in the New York action arise out of Brazas's products and fall directly within the products-completed operations hazard exclusion in the general liability policy, we hold that American Empire could reasonably have concluded that the New York action was outside the scope of coverage and, thus, that it owed Brazas no duty to defend.  For similar reasons, this Court holds that the appellant's consumer protection claim is baseless.

-20-

Thus, we **affirm** the district court's grant of summary judgment in favor of American Empire.