# United States Court of Appeals
## For the First Circuit

No. 18-2244

CRAIG R. JALBERT,
in his capacity as Trustee of the F2 Liquidating Trust,

Plaintiff, Appellant,

v.

ZURICH SERVICES CORPORATION, d/b/a Zurich American
Insurance Co.; and X.L. GLOBAL SERVICES, INC., d/b/a
XL Catlin Specialty Insurance Co.,

Defendants, Appellees.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Rya W. Zobel, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Torruella, and Thompson, Circuit Judges.

———————————

Andrew B. Ryan, with whom Robert J. Giglio, Jr., Ryan Law
Partners LLP, William Baldiga, and Brown Rudnick LLP were on brief,
for appellant.
Andrew L. Margulis, with whom Ropers, Majeski, Kohn & Bentley,
P.C. was on brief, for appellee Zurich American Insurance Co.
Cara Tseng Duffield, with whom Wiley Rein LLP was on brief, for
appellee XL Specialty Insurance Co.

———————————

March 20, 2020

———————————

**TORRUELLA**, **Circuit Judge**.   This case involves an insurance coverage dispute between plaintiff-appellant Craig R. Jalbert ("Jalbert"), in his capacity as trustee of the F2 Liquidating Trust -- a trust established during the bankruptcy proceedings of former investment advisory firm F-Squared Investments, Inc. ("F-Squared")[1] -- and two of F-Squared's excess insurers.

Jalbert filed suit against Zurich American Insurance Co. ("Zurich") and XL Specialty Insurance Co. ("XL") (collectively, the "Excess Insurers") to recover unreimbursed defense costs that F-Squared incurred in connection with a Securities and Exchange Commission ("SEC") investigation of F-Squared.   Jalbert claimed that the Excess Insurers' refusal to cover those costs constituted a breach of their insurance contracts.   The Excess Insurers argued that F—Squared is not entitled to coverage because the underlying claim at issue here should be deemed to have been "first made" before their respective policies took effect on October 3, 2013. Jalbert, on the other hand, asserted that enforcement proceedings against F-Squared were not a reasonable possibility until after

---

[1]  The F2 Liquidating Trust was "established . . . to recover on behalf of F-Squared as its successor-in-interest."  Jalbert v. SEC, 945 F.3d 587, 589 (1st Cir. 2019).

-2-

the Excess Insurers' policy period began to run and thus, that the underlying claim was first made within the policy period.

The Excess Insurers filed motions for summary judgment, which Jalbert opposed. In granting summary judgment for the Excess Insurers, the district court held that an SEC order issued on September 23, 2013 -- before the start of the Excess Insurers' coverage period -- initiated an investigation of F-Squared based on information tending to show that F-Squared had violated federal securities laws. The court ruled that this order triggered the policy's "deemed-made" clause, which meant that the claim was deemed "first made" at that time, prior to the Excess Insurers' policy taking effect. Jalbert now appeals the grant of summary judgment to the Excess Insurers. After careful review, we affirm, finding that the SEC investigation is a claim that is deemed to have been first made when the SEC order issued on September 23, 2013, prior to the inception of the Excess Insurers' policies and thus outside of their coverage period.

## I. Background

### A. Factual Background

#### 1. The SEC Investigation

On September 23, 2013, the SEC began a private investigation of F-Squared by issuing an "Order Directing Private Investigation and Designating Officers to Take Testimony" in a

non-public document captioned "In the Matter of F-Squared Investments, Inc., (B-2855)" (the "Formal Order"). The Formal Order indicated that the SEC had information that tended to show that, from at least January 1, 2009, F-Squared and some of its affiliated entities and individuals had distributed false and misleading advertisements to clients or prospective clients in possible violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, and the Investment Company Act of 1940. It ordered "that a private investigation be made to determine whether any persons or entities ha[d] engaged in, or [were] about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object." The Formal Order also empowered certain SEC officers to issue subpoenas, take evidence, and require the production of relevant documents. On September 30, 2013, the SEC issued a "Supplemental Order Designating Additional Officers" to the investigation. The order shared the same caption as the Formal Order.

On October 2, 2013, the SEC's Division of Enforcement served a subpoena on F-Squared in connection with F-Squared's "formal investigation." The subpoena requested documents pertaining to, among other things, F-Squared's advertisements, marketing materials, presentations, documents, due diligence and

performance records, and communications concerning one of its investment strategies. The subpoena bore the same caption as the Formal Order and expressly referenced the Formal Order as authorizing its issuance. On October 7, 2013, the SEC served deposition subpoenas on F-Squared's CEO, Howard Present, and its Managing Director, Richard Tomney. Both subpoenas bore the same caption as the Formal Order and the October 2, 2013 subpoena.

On October 17, 2013, F-Squared requested a copy of the Formal Order from the SEC, which the SEC provided the next day, along with a copy of the supplemental order designating additional officers. F-Squared amassed millions of dollars in defense costs as a result of the investigation.

**2. The Insurance Policies**

**a. The 2012-2013 Policies**

F-Squared had a primary $5 million insurance policy from Columbia Casualty Company ("Columbia") for the period of October 3, 2012 to October 3, 2013. F-Squared also obtained an excess policy from Federal Insurance Company ("Federal") for an additional $5 million in excess coverage (after the Columbia policy exhausted its $5 million limit) for the same period. The Federal policy is a "follow-form" policy to Columbia's, meaning that

-5-

coverage is subject to the terms and conditions of the primary policy (here, Columbia), unless otherwise specified.[2]

The Columbia policy (and therefore the Federal policy) covers only "any claim first made against [F-Squared] during the policy period." The policy defines "Claim" to include:

> a formal regulatory proceeding (civil, criminal or administrative) against or formal investigation of an Insured, including when such Insured is identified in a written Wells[3] or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of securities or other laws by such Insured . . . for a Wrongful Act . . . .

A "Wrongful Act," in turn, is defined as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty."

The key policy provision for this appeal is the "Deemed-Made Clause," which provides guidance to determine when

---

[2] For this reason, we will look to the language of the Columbia policy when analyzing Jalbert's claims against the Excess Insurers.

[3] The SEC defines a Wells Notice as "a communication from the staff to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the [SEC] file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the [SEC's] Division [of Enforcement] and the [SEC] concerning the proposed recommendation." SEC Div. of Enf't, Enforcement Manual 19-20 (2017).

-6-

certain claims are deemed "first made" and therefore, whether they are covered by the policy. With respect to a formal investigation, the clause provides that "[a] Claim shall be deemed first made" upon "an Insured being identified by name in an order of investigation, subpoena, Wells Notice or target letter . . . as someone against whom a civil, criminal, administrative or regulatory proceeding may be brought."

### b. The 2013-2014 Policies

F-Squared renewed both the Columbia and Federal policies for the policy period running from October 3, 2013 to October 3, 2014. For this same period, F-Squared also sought additional excess coverage from the Excess Insurers. Zurich issued a $5 million second excess policy and XL issued a $5 million third excess policy for F-Squared.[4] Thus, for the 2013-2014 policy period, F-Squared had a total of $20 million in liability insurance coverage. The Excess Insurers' policies followed the terms, conditions, and limitations of the 2013-2014 Columbia policy and the other underlying policies (which also followed the Columbia policy). All four 2013-2014 policies, thus, applied "only to any claim first made against [F-Squared]" between October 3, 2013 and

---

[4] Coverage under the Zurich policy applied once the primary and first excess policies had been exhausted, and coverage under the XL policy applied when the first two and the Zurich policies' limits were reached.

October 3, 2014. The relevant provisions of the 2013-2014 Columbia policy remained substantively unchanged from those in the 2012-2013 Columbia policy, which we have already described.

**3. F-Squared Seeks Coverage**

On November 7, 2013, F-Squared emailed Columbia a "notice of claim" letter informing it of the October 2 and October 7 subpoenas in connection with "a formal investigation by the [SEC]," for which it had retained counsel. F-Squared attached the subpoenas (but not the Formal Order) and requested coverage under the 2012-2013 policy "or its renewal which ha[d] not yet been received," as well as "confirmation of coverage under all applicable policies issued by [Columbia]."[5] It also forwarded the letter to Federal, Zurich, and XL. On December 10, 2013, Columbia agreed to provide coverage under the 2012-2013 policy for the defense costs incurred, and ultimately paid up to the $5 million limit of liability. Federal also paid its $5 million limit of liability under its 2012-2013 policy. The Excess Insurers, however, denied coverage to F-Squared on the basis that the SEC investigation constituted a claim first made prior to the 2013-2014 policy period and thus outside the policies' coverage.

---

[5] In the letter's subject line, F-Squared made reference to "Policy Number: 287443198 (renewed)."

## B. Procedural History

On November 10, 2017, after F-Squared filed for bankruptcy, Jalbert sued the Excess Insurers in the United States District Court for the District of Massachusetts for breach of contract. Jalbert alleged that the Excess Insurers breached their contractual duty under their respective insurance policies to reimburse F-Squared for defense costs incurred in connection with its response to the SEC investigation. On February 28, 2018, the Excess Insurers each filed motions for summary judgment on multiple grounds, including that F-Squared was not entitled to coverage because the underlying claim was not deemed to have been first made during the effective policy period commencing on October 3, 2013. [6] Jalbert countered that the Deemed-Made Clause was inapplicable because the Formal Order did not state that the SEC would bring a proceeding against F-Squared.

On September 5, 2018, the district court granted the Excess Insurers' motions for summary judgment. Jalbert v. Zurich Servs. Corp., 325 F. Supp. 3d 212 (D. Mass. 2018). The court found that based on the plain language of the policy, the Formal Order "clearly fit[]" within the Deemed-Made Clause because "it sufficiently identifie[d] F-Squared 'as someone against whom a

---

[6] XL joined and incorporated the arguments in Zurich's motion for summary judgment into its own motion.

-9-

civil, criminal, administrative, or regulatory proceeding may be brought.'" Id. at 215. Specifically, it pointed out that the Formal Order "identifie[d] F-Squared by name, allege[d] numerous 'possible violation[s]' of federal securities laws, and direct[ed] the commencement of an investigation." Id. The court also rejected Jalbert's argument that the policy was ambiguous, instead finding that the Deemed-Made Clause's language was "expansive" and that the clause was satisfied "by an order that presages the likelihood of proceedings." Id. at 215-16. It reasoned that the Formal Order met that "low bar because it initiated a private investigation based on information tending to show that F-Squared had violated numerous federal laws." Id. at 215. The court concluded that "[s]ince that order [was] issued on September 23, 201[3],[7] before the coverage period of the Zurich and XL policies, neither defendant is obligated to reimburse F-Squared for its defense costs." Id. (footnote added). F-Squared then appealed the district court's order.

---

[7] Initially, the district court correctly pointed out that the Formal Order had issued on September 23, 2013. Jalbert, 325 F. Supp. 3d at 213. Later in the opinion, presumably inadvertently, it began referring to the order as issued on September 23, 2012. It is undisputed that the SEC issued the Formal Order on September 23, 2013.

## II.  Discussion

Because Jalbert appeals from a grant of summary judgment to the Excess Insurers, we review the order below de novo, affirming only "if there is no genuine issue of material fact and [the Excess Insurers are] entitled to judgment as a matter of law." BioChemics, Inc. v. AXIS Reinsurance Co., 924 F.3d 633, 638 (1st Cir. 2019).  "The interpretation of an insurance policy is a question of law," UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co., 929 F.3d 11, 20 (1st Cir. 2019) (quoting Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012)), which we also review de novo, Zurich Am. Ins. Co. v. Elec. Me., LLC, 927 F.3d 33, 35 (1st Cir. 2019) (citing Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co., 489 F.3d 71, 72 (1st Cir. 2007)).

### A.

Under Massachusetts law -- the law applicable in this diversity case, see Sanders v. Phoenix Ins. Co., 843 F.3d 37, 42 (1st Cir. 2016) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)) -- "we construe an insurance policy under the general rules of contract interpretation, beginning with the actual language of the policies, given its plain and ordinary meaning."  Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 91 (1st Cir. 2019) (quoting AIG Prop. Cas. Co. v. Cosby, 892 F.3d 25, 27 (1st Cir. 2018)).  Along the way, we must be cognizant of "what

-11-

an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000) (quoting GRE Ins. Grp. v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995)).  We deem a term to be ambiguous if it is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  Easthampton Congregational Church, 916 F.3d at 92 (quoting U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc., 797 F.3d 116, 119-20 (1st Cir. 2015)).  If that is the case, the ambiguity will be construed against the insurer.  Valley Forge Ins. Co., 670 F.3d at 97.  An ambiguity will not exist, however, "simply because the parties disagree about the proper interpretation of a policy provision."  Id.  With this in mind, we turn to the relevant policy provision.

## B.

The Columbia policy (the primary policy), which the excess policies follow, is a "claims made" policy.  This type of policy generally "covers acts and omissions occurring either before or during the policy term, provided the claim is discovered and reported to the insurer during the same policy term." Lind-Hernández v. Hosp. Episcopal San Lucas Guayama, 898 F.3d 99, 101 (1st Cir. 2018) (citing DiLuglio v. New Eng. Ins. Co., 959

-12-

F.2d 355, 358 (1st Cir. 1992)).  This Court has explained that

"claims made" policies are based on the idea that

> [a]s it is often difficult to ascertain the precise
> date of the act or omission which constituted the
> alleged [wrongful act] . . . the pivotal event for
> insurance coverage purposes becomes the date the claim
> is made against the insured, rather than the date of
> the act or omission forming the basis for the claim.

Id. at 101-02 (first and second alterations in original) (quoting

DiLuglio, 959 F.2d at 358).

In its Deemed-Made Clause, the Columbia policy contains

instructions to determine when a claim is "first made" and coverage

attaches.  It states that:

> A Claim shall be deemed first made on the following
> dates:
>
> . . . .
>
> (c) with respect to a formal investigation[,]
> . . . upon:
>
> i. an Insured being identified by name in an order of
> investigation, subpoena, Wells Notice or target
> letter . . . as someone against whom a civil,
> criminal, administrative or regulatory proceeding may
> be brought . . . .

(emphasis added).  The parties agree that the SEC investigation,

commenced by the Formal Order, is a "formal investigation" and

thus a "Claim" as that term is defined in the policies.  It is

further undisputed that the Formal Order is "an order of

investigation" that identifies F-Squared by name.  Therefore, we

must only decide whether the September 23, 2013 Formal Order

-13-

identifies F-Squared "as someone against whom a civil, criminal, administrative or regulatory proceeding may be brought" such that the claim is deemed first made upon its issuance and prior to the Excess Insurers' coverage period beginning on October 3, 2013.

## C.

Jalbert presses two main arguments in support of his contention that the costs of the SEC investigation should be covered under the Excess Insurers' policies. First, he argues that the Deemed-Made Clause is not satisfied by the Formal Order because the SEC investigation was not conclusive proof that enforcement proceedings against F-Squared were a "reasonable possibility." Second, he avers that the Deemed-Made Clause is ambiguous and we should construe it in the manner most favorable to F-Squared. We address each argument in turn.

## 1.

Jalbert begins by contending that the district court erred in ruling that the phrase "may be brought" in the Deemed-Made Clause was "plainly expansive" and that it was "satisfied by an order that presages the likelihood of proceedings." According to Jalbert, the word "may" commonly means "a reasonable possibility," and the court erred in equating it with "might," which represents a possibility that is more tentative or remote. On the "continuum of possibility," Jalbert avers, "may" denotes a "moderate

-14-

possibility" of an event occurring, while "might" denotes a "weak possibility."

Jalbert further believes the Formal Order fails to indicate "whether (or to what extent) SEC proceedings against F-Squared [were] a [reasonable] possibility" and therefore, he contends that the district court erred in finding that the Formal Order signified that a civil, criminal, administrative, or regulatory proceeding might be brought against F-Squared. To make his case, Jalbert asserts that a reasonable juror could find that an investigation is distinct from an enforcement proceeding. He further refers to the SEC Enforcement Manual to add weight to his claim that the Formal Order was "purely investigatory," because it "seeks to determine whether a violation of the federal securities laws may have occurred or may be occurring"; moreover the individuals running the investigation cannot adjudicate any claim and any enforcement action must be authorized by the SEC.

Lastly, Jalbert attempts to further elucidate why the Formal Order does not "incontrovertibly show" that SEC proceedings were "a reasonable possibility" by contrasting a Wells Notice or target letter with the Formal Order. He asserts that the former "clearly, directly, and unequivocally tells the recipient that proceedings may be brought against them" after securities-laws violations have been preliminarily determined or a target of an

-15-

investigation has been identified based on "substantial evidence." The latter "neither threatens nor suggests possible proceedings."

We do not find Jalbert's arguments persuasive. Instead, we agree with the district court that the Formal Order satisfies the Deemed-Made Clause because the order "presages the likelihood of proceedings." See Jalbert, 325 F. Supp. 3d at 215. In other words, we find that the Formal Order identified F-Squared "as someone against whom a civil, criminal, administrative or regulatory proceeding may be brought."

Black's Law Dictionary defines the verb "may" as "[t]o be permitted to"; "[t]o be a possibility"; "[l]oosely, is required to; shall; must." May, Black's Law Dictionary (11th ed. 2019) (emphasis added); see Brazas Sporting Arms, Inc., 220 F.3d at 4 (instructing that courts consider the plain and ordinary meaning of policy language). Based on this ordinary meaning, a claim relating to a formal investigation will be deemed first made when an insured is identified by name in one of the qualifying documents (here, an order of investigation) as someone against whom there is a possibility that a proceeding will be brought. At a minimum, the Formal Order expressed such a possibility. It indicated that F-Squared may have violated several federal securities laws. Furthermore, it expressly directed "that a private investigation be made to determine whether" F-Squared had actually engaged or

-16-

was going to engage in "acts or practices" that violated any of the securities laws listed in the order. Moreover, this order was issued by the SEC's Division of Enforcement and designated officers to issue subpoenas, take evidence, and request the production of documents, which further supports an inference that the institution of proceedings was possible. Indeed, the SEC served a subpoena on F—Squared related to the matter in the Formal Order as soon as October 2, 2013.

Based on the Formal Order alone, a reasonable jury would have to find that a civil, criminal, administrative, or regulatory proceeding against F-Squared was at least a possibility. It would be unreasonable for a jury to interpret the Formal Order as not carrying with it a possibility that an enforcement proceeding would follow. Likewise, if the Formal Order had issued during the policy period, a reasonable insured in F-Squared's position would have expected to be covered under the policy for its expenses in connection with the SEC investigation. See Brazas Sporting Arms, Inc., 220 F.3d at 4 (noting that in construing the language of a policy, we must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered" (quoting GRE Ins. Grp., 61 F.3d at 81)). The Deemed-Made Clause requires nothing more. To that end, the clause is devoid of any qualifying terms to express what degree of possibility is needed

to satisfy it. Thus, while Jalbert attempts to make a distinction between different levels of possibility, we agree with the district court that the plain language of the clause is expansive and is fulfilled by the possibility of proceedings that the Formal Order presented.

Jalbert goes to great lengths to resist this conclusion by attempting to distinguish the concept of an SEC investigation from that of an enforcement action. He contends that based on this distinction, a jury could find that the Formal Order did not indicate whether an enforcement proceeding against F-Squared was not a reasonable possibility. Jalbert points to Center for Blood Research, Inc. v. Coregis Insurance Co., 305 F.3d 38 (1st Cir. 2002), for the proposition that an enforcement proceeding is instituted separately from an investigation. He similarly relies on MusclePharm Corp. v. Liberty Insurance Underwriters, Inc., citing part of that opinion that states that through a formal order, "the SEC was not seeking relief, but was only gathering information," 712 F. App'x 745, 754 (10th Cir. 2017), and concluding that a regulatory investigation was not a proceeding, id. at 755. Nevertheless, this argument misses the point. The investigation does not need to be an enforcement action or proceeding, or actually result in one, for the plain language "may be brought" in the Deemed-Made Clause to be satisfied; there must

be only a possibility of a future enforcement action for the claim to be deemed first made. Thus, for purposes of this appeal, Jalbert's distinction is one without any practical difference.[8]

Furthermore, Center for Blood Research, Inc. concerned an investigative subpoena, which we found merely requested information from a party. 305 F.3d at 42-43. In contrast, this case involves a formal order from the SEC ordering investigation into various of F-Squared's actions which, if verified, would constitute violations of multiple federal laws. Unlike a mere request for information, the Formal Order therefore identified F-Squared "as someone against whom" an enforcement "proceeding may be brought," which suffices to deem a "claim" to have been "first made" under the Deemed-Made Clause here. Moreover, unlike the contract in Center for Blood Research, Inc., F-Squared's policy covers formal investigations and does not require a "judicial or administrative proceeding in which [the] insured(s) may be subjected to a binding adjudication of liability." Id. at 42. MusclePharm Corp. is likewise distinguishable from the case at hand. There, the court considered whether an SEC formal order and subpoenas were "claim[s]" as defined in the applicable policy to

_____

[8] For these same reasons we find futile Jalbert's references to the SEC Enforcement Manual to attempt to show that the Formal Order was simply an investigation and not an enforcement action.

-19-

include "a written demand for monetary or non-monetary relief" or "a formal administrative or regulatory proceeding." 712 F. App'x at 753. The court ultimately held that they were not. Id. at 755. The definition of "claim" in that case is remarkably different from the provision at issue in this appeal, and a comparison to this scenario is inapposite.

Jalbert's contrasting of the Formal Order with a Wells Notice or target letter is similarly unavailing. The institution of proceedings need not be a certainty. As we already said, the Deemed-Made Clause here is satisfied by simply a possibility that those proceedings will take place, and the Formal Order delineating potential securities-law violations carries that future possibility. Furthermore, Jalbert's proposed reading is unsupported because the clause provides that the insured be named in "an order of investigation, . . . Wells Notice or target letter . . . as someone against whom [one of the qualifying proceedings] may be brought." Jalbert's interpretation that a Wells Notice or target letter, but not the Formal Order, satisfy the possibility that an enforcement action would be commenced would render meaningless the inclusion of "order of investigation" in the Deemed-Made Clause. See UBS Fin. Servs., Inc. of P.R., 929 F.3d at 24 (stating that we would not construe a term in a way that would render meaningless other terms of the policy). Because

-20-

adopting Jalbert's view would require us to rewrite the policy in a way that would change the terms of coverage, we refuse to do so.

**2.**

Unrelenting, Jalbert argues that the Deemed-Made Clause is ambiguous, which he contends entitles him to the interpretation of the policy that is more favorable to F-Squared. To prove ambiguity, Jalbert asserts that "reasonably intelligent persons would differ" about the interpretation of the clause based on "the level of possibility" a person could assign to the word "may." He asks us to solve the purported ambiguity against the insurer.

Jalbert's argument that the clause's use of the word "may" renders it ambiguous is unpersuasive. Although it is feasible the word "may" connotes differing levels of possibility depending on the context, "the mere existence of multiple dictionary definitions of a word, without more" does not suffice to create ambiguity. Ctr. for Blood Research, 305 F.3d at 41 (internal quotations omitted). Nor does ambiguity exist because a controversy exists between the parties. See Certain Interested Underwriters at Lloyd's, London v. Stolberg, 680 F.3d 61, 66 (1st Cir. 2012) ("[A]mbiguity -- unlike beauty -- does not lie wholly in the eye of the beholder. . . . A policy provision will not be deemed ambiguous simply because the parties quibble over its meaning."). A term "is ambiguous only if it is susceptible

of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Id. (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)). In any event, we cannot see how an interpretation of the word "may" having different "levels of possibility" would change the result reached above.

Even if the Deemed-Made Clause required the "reasonable possibility" of an enforcement proceeding, a reasonable insured would read the Formal Order, which identified F-Squared as the subject of an investigation into conduct that constituted or could constitute violations of securities laws, to express a "reasonable possibility" that an enforcement action would be brought against it and would expect coverage at that point. See Brazas Sporting Arms, Inc., 220 F.3d at 4. There is no supportable basis from which a jury could find that the Deemed-Made Clause is not triggered by the Formal Order. The claim here, then, is deemed to have been made at the time the Formal Order was issued on September 23, 2013. The Excess Insurers' policies did not take effect until October 3, 2013, and thus the claim was deemed made outside their coverage period. Accordingly, the Excess Insurers are not obligated to reimburse F-Squared for its defense costs.[9]

---

[9] Because we conclude that F-Squared's claim for the SEC investigation is deemed to have been first made outside the Excess Insurers' policies' coverage period, we need not reach the separate

## III. <u>Conclusion</u>

For the foregoing reasons, we affirm the district court's decision granting summary judgment in favor of the Excess Insurers.  The parties shall bear their own costs.

**<u>Affirmed</u>.**

---

issues of whether the Prior Notice Exclusion or the Prior or Pending Exclusion bar coverage for the investigation.